SECOND DIVISION

December 28, 2001 

Nos. 1-00-3253, 1-00-4127, 1-00-4128, 1-00-4129,1-00-4130,

1-00-4132, 1-00-4214, 1-00-4260, 1-01-0026,1-01-0246, 

1-01-0342, 1-01-0343, 1-01-0344, 1-01-0443,1-01-0444,

1-01-0445, 1-01-0446, 1-01-0487, 1-01-0945,1-01-0986,

1-01-0991, 1-01-0992, 1-01-0993, 1-01-0994,1-01-0996,

1-01-1178, 1-01-1189, 1-01-1190, 1-01-1191,1-01-1215,

1-01-1216, 1-01-1217, 1-01-1220, 1-01-1553,1-01-1572,

1-01-1630, 1-01-1695, 1-01-1773, 1-01-1782,1-01-1821,

1-01-1822, 1-01-1845, 1-01-1880, 1-01-1933,1-01-2033,

1-01-2037, 1-01-2039, 1-01-2040 (Consolidated)

In 
re
 POSSESSION AND CONTROL OF THE COMMISSIONER OF BANKS AND REAL ESTATE OF INDEPENDENT TRUST CORPORATION, a/k/a Intrust, an Illinois Corporate Fiduciary

(The Commissioner of Banks and Real Estate; PriceWaterhouseCoopers, LLP, as Receiver of Independent Trust Corporation, a/k/a Intrust, and Millennium Trust Company, LLC, as Successor Trustee, 

Appellees;

J. Phillip O'Brien, Intrust Account Holder, 
 et al.
, Parties in Interest, 

Appellants). 

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the 

Circuit Court of

Cook County.

Honorable

Sidney A. Jones III

Sophia R. Hall, 

Judges Presiding.

JUSTICE GORDON delivered the opinion of the court:

Appellants, numerous groups of approximately 1,200 non-cash- asset account holders,
(footnote: 1) appeal an order of the circuit court of Cook County allocating a $68.1 million cash shortage from trust funds deposited for investment with Independent Trust Corporation (Intrust).  The trial court allocated the shortage among all account holders, even those whose assets were noncash at the time Intrust was placed in receivership because virtually all cash deposited with Intrust, including that used to acquire noncash assets, was commingled in a single, common account.  The noncash account holders argue that only the cash account holders should bear the burden of the $68.1 million loss.  Appellants also appeal the trial court's order authorizing the receiver to charge its fees and expenses to the individual trust accounts via a levy on the accounts.  We disagree with appellants that the trial court erred in allocating the shortage to all account holders.  However, we do agree with appellants that the trial court erred in charging all of the receiver's fees and expenses to the individual accounts and remand on this issue.

STATEMENT OF FACTS

Intrust was an Illinois corporate fiduciary organized under the Corporate Fiduciary Act (Act) (205 ILCS 620/1-1 
et seq.
 (West 1998)) and was regulated by the Illinois Commissioner of Banks and Real Estate (Commissioner).  Intrust served as the custodian for various investment trust assets, including individual retirement accounts (IRAs), qualified benefit plans, Starker trusts, personal trusts, and Illinois land trusts, that its customers (appellants and others who have not appealed) placed in its custody.  The assets were managed either by the customers or their investment advisors in a wide variety of investments, including cash, money market funds, stocks, mutual funds, limited partnerships, life insurance policies, tax lien certificates, and promissory notes.  Intrust did not exercise discretion in investing assets deposited with it although, according to appellants, Intrust did manage money left in its "cash management program."  Those customers who traded in commodity futures contracts and options, who utilized the cash management program, agreed to leave 30% of the principal balance of their accounts on deposit with Intrust in the form of cash as a safety net for margin calls.
(footnote: 2)
 As of April 14, 2000, Intrust had approximately 17,000 customers and acted as custodian for approximately $1.84 billion in assets.  Intrust's accounts were extremely active, averaging 200,000 transactions per week.  These transactions included both the deposit of cash and noncash assets into trust accounts as well as the purchase and sale of securities and other noncash assets.  Because of the volume of transactions conducted, Intrust held large amounts of cash on a daily basis.  Intrust held all cash in a single, commingled account designated as its money market cash trust fund (commingled account).  The cash of virtually every account holder passed through the commingled account, albeit perhaps only briefly, at some time.  Specifically, cash newly deposited with Intrust
(footnote: 3) was placed in the commingled account before an account holder's investment instructions were carried out.  From there, depending on the account holder's instructions, the cash would remain in the commingled account, be transferred to another depository institution, be transferred to an escrow account at Intercounty Title Company (Intercounty), or used to purchase specific noncash assets.  Money was deposited into the commingled account when another depository institution transferred money back to Intrust, when Intercounty transferred money back to Intrust, when a noncash asset was liquidated in connection with a new investment purchase (if another noncash asset was purchased, the money would then again leave the commingled account) or to generate cash to pay custodial fees and investment advisory fees, or when, in an effort to close an account, a noncash asset was liquidated.  Most, if not all, purchases and sales of noncash assets required cash or produced cash, which passed through the commingled account.  Intrust used computerized accounting software, which, according to PriceWaterhouseCoopers, LLP, the receiver appointed upon commencement of the receivership, was limited and out of date, to keep track of account records.  According to the receiver, this software was unable to recreate historical account transactions and account balances on any given day.

From December 1990 through April 23, 1999, Intrust transferred substantial portions of cash from the commingled account to the custody of Intercounty on approximately 41 occasions,
(footnote: 4) which in turn, commingled the money it received from Intrust with funds of its own customers.  Intrust accounted for the amounts held at Intercounty in the commingled account ledger.  Although some of the money transferred to Intercounty was returned to Intrust's custody and deposited into the commingled account, a majority of the funds were never returned.
(footnote: 5)  

The Commissioner directed Intrust to reestablish control over the funds transferred to Intercounty and because Intrust failed to comply, on April 14, 2000, the Commissioner seized control of Intrust pursuant to the Act, by letter appointed PriceWaterhouseCoopers, LLP, as receiver, and commenced an action for dissolution and liquidation of Intrust through receivership in the circuit court of Cook County via a verified complaint. 

On April 17, all 17,000 account holders were sent a letter by first class mail informing them that cash was missing from Intrust and that the company was in liquidation.  The letter advised account holders that the receiver was undertaking an investigation and would determine how the cash shortage would affect their accounts.  It also informed account holders that all accounts were frozen.  Lastly, the letter stated that due to the substantial cost of sending written communications to all account holders, such communications would be made with the account statements or account holders could obtain up-to-date information on Intrust's website.

In response to the receiver's motion to set a hearing on the allocation and direct the method of notice to provide to account holders, the trial court entered an order setting a hearing and approving the form of the notice.  The order contained identical information as that to be embodied in the notice form and, as such, need not be detailed.  Both the order itself and the notice form were posted on Intrust's website.  In addition, the receiver mailed the notice, by first class mail, to all 17,000 account holders.  The notice stated that the receiver would be filing its recommendation with respect to the proposed allocation by June 23 and that a hearing was set for July 28 following.  

According to the notice, at the allocation hearing, the trial court would consider the receiver's recommendation, hear evidence, and issue a determination as to the method of allocation, which determination would be binding upon the accounts holders and may affect their rights to assets in their accounts.  The notice advised account holders that the recommendation would be posted on Intrust's website and that those account holders who did not have access to the Internet were to so advise the receiver, in writing, and if they desired a copy of the recommendation, to request a copy from the receiver.  The receiver would then mail its recommendation by first class mail to those account holders.  Account holders were informed to file any objections to the receiver's recommendation by July 14.

The receiver conducted an examination and filed its initial recommendation with the court, revealing that as of April 14, Intrust held $1.74 billion worth of noncash assets for its account holders, all of which were located and fully accounted for.  Also, at this time, Intrust's books showed that it should be holding $102 or $103 million in cash.  However, the receiver was unable to locate approximately $68.1 million, consisting of $51 million transferred to Intercounty and $17 million in interest accruing on that amount.  The investigation revealed that these funds were misappropriated by Intercounty over the last 10 years.  The receiver instituted litigation against Intercounty on June 1.  

The receiver further stated that because Intrust used a single, commingled account in virtually all of its transactions, including those between it and Intercounty, its financial records were incomplete, its accounting software was not able to create historical account information, many accounts holders departed prior to the time of the receivership, and the tremendous number of transactions conducted by Intrust, it was impossible to ascertain which account holders' funds were deposited or withdrawn from Intercounty on any particular date and, therefore, which specific accounts were affected by the misappropriation, 
i.e.
, it could not trace the missing funds to any specific accounts.  

After setting forth alternative possible allocation formulas, the receiver recommended to allocate the shortage to all accounts, not just those accounts containing cash, because of the inability to actually trace the missing funds to any specific accounts and to use the entire balance of the accounts, rather than the cash only balance of the accounts.  The receiver recommended excluding the following accounts: (1) accounts opened after April 23, 1999 (the date of the last transfer to Intercounty); (2) land trusts; (3) bookkeeping accounts; and (4) accounts closed prior to April 14, 2000 (the commencement date of the receivership).  The receiver recommended using the April 30, 2000, account balances as the date of valuation, backing out withdrawals and deposits made between April 15 and April 30.  Potential sources for recovery of the loss were identified as including insurance coverage and litigation against Intercounty.  Thereafter, approximately 300 account holders filed objections to the receiver's recommendation, alleging multifaceted theories and arguments. 

Subsequently, the court held a hearing on the receiver's recommendation and many accounts holders (the exact number is not disclosed by the record) were represented by counsel and made arguments to the court, offering alternative allocation methods.  At the conclusion of the hearing, the trial court stated that it would largely follow the receiver's recommendation, but it would entertain motions to exclude accounts whose holders could demonstrate their funds were not at risk of being included in the money transferred to Intercounty.  Specifically, the court would consider excluding an account from the allocation process if it satisfied one of the following: "(1) the account never contained cash; (2) the account balance on April 23, 1999, was zero or 
de minimus
; [or] (3) substantially all cash in the account was not subject to risk."  Notice of this decision was posted on Intrust's website, which notice the court found sufficient, reasonable, and adequate.  In response to the trial court's decision, over the course of the next few months, a multitude of account holders filed motions to exclude their accounts from the allocation.  

After an initial hearing on the receiver's proposed allocation at which 24 attorneys were present representing numerous groups of account holders who were permitted to make extensive comments and suggested revisions with respect to matters raised by the receiver's proposed order, the court first found that the notice and opportunity for hearings available to account holders were reasonable and adequate.  The court then ordered that the following accounts would be excluded from the allocation process: (1) accounts opened after April 23, 1999; (2) Illinois land trusts; (3) bookkeeping accounts; and (4) accounts which contained double-counted assets.  The court reiterated that it would consider excluding those accounts specifically identified in its prior order and that account holders seeking an exclusion should file motions to exclude.  In addition, because approximately 5,000 motions to exclude had been filed, many of which presented similar factual or legal issues, the court ordered the receiver to identify and categorize the motions, to choose as many motions as necessary out of each group to fully detail the common issue presented, to identify these chosen motions as exemplar motions, and post copies of them on Intrust's website.  Lastly, at the conclusion of this hearing, the trial court denied certain objections filed by account holders and requests to surrender particular noncash assets, finding that because deposits with Intrust were commingled in a single fund, allocation would be made among all accounts. 

Thereafter, the trial court held a hearing on the receiver's motion for authorization of fees.  The receiver filed a motion seeking to charge the individual account holders (as opposed to Intrust's assets) fees and expenses to defray the expenses of continued administration of the receivership and winding up of the receivership estate.  The motion described the activities the receiver had undertaken and the activities it still needed to undertake.  The receiver estimated that it would incur expenses of $500,000 per month to carry out its activities.  Prior to the motion, the Commissioner preapproved fees at a blended rate of $240 per hour for accountants and $325 per hour for attorneys.  Several hundred account holders opposed this motion.
(footnote: 6)  At the hearing, the court heard objections and arguments from account holders after which it overruled the account holders' objections and authorized the receiver to charge a sliding scale fee across the board to all account holders.
(footnote: 7)
 A second hearing was conducted with respect to the receiver's proposed order of allocation.  At this time, the court also heard objections to the proposed process of hearing exemplar motions to exclude.  Over 50 attorneys were present representing account holders.  The trial court thereafter entered an order stating that it would hear exemplar motions to exclude during the week of September 25.  Despite the court's ruling, additional account holders subsequently filed objections to the exemplar process, which the trial court ultimately overruled following an additional hearing on the objections.

During the course of the proceedings, two groups of account holders served interrogatories and requests to produce upon the receiver.  Account holders sought detailed information with respect to each and every transfer from Intrust to Intercounty, information with respect to all bank accounts maintained by Intrust, and bank statements from each bank account during the misappropriation period.  Because the receiver did not answer discovery, they filed a motion to compel.  It was the receiver's position that discovery was neither necessary nor appropriate, particularly since the discovery was not directed at any specific account but, rather, was directed broadly at Intrust's business as a whole.  According to the receiver, all accounts held by Intrust were at risk and how money moved from one place to another was irrelevant.  At least 16 attorneys were present at the hearing on the motion representing account holders.  The motion was subsequently denied.

During the week of September 25, the trial court conducted hearings on the exemplar motions to exclude.  Following the hearings, the trial court granted some of the motions to exclude and denied others.  Generally, the trial court granted exclusions for those funds deposited into an account subsequent to April 23, 1999,
(footnote: 8) including any deposits made after 12:20 p.m.--the time of the last transfer to Intercounty, trustee-to-trustee transfers, accounts that never contained cash, accounts with a zero balance as of April 23, 1999, and bookkeeping accounts.  The court also excluded any account opened subsequent to April 23, 1999, but only if the account was not funded with proceeds of assets held at Intrust prior to April 23.  

The court denied exclusions where account holders argued that they could show their funds went into the account one day and out the next, accounts holders who could show that their accounts contained no cash on the misappropriation dates, accounts holders who argued that their funds were not deposited until after a substantial amount of money had already been misappropriated, account holders who argued that they opened their accounts only a short time prior to April 23, 1999, and account holders who argued that the misappropriation should be allocated only to the cash balance of accounts, not to the entire balance.  The basis for each of these denials was the trial court's finding that if money was deposited at Intrust, it was commingled, "whether one week, one day, one hour, or one minute" and, therefore, subject to risk of loss to misappropriation.  

Subsequent to these rulings, at least one motion for reconsideration was filed and numerous notices of appeal were filed.  In addition, because not all motions to exclude were determined during the week of September 25, additional hearings were held and appropriate additional orders entered, excluding or including specific accounts.

Thereafter, the trial court approved a purchase and assumption agreement entered into between Intrust and Millennium Trust Company LLC (Millennium) pursuant to which Millennium would take over the trust accounts and most of Intrust's corporate assets.  Millennium was to be responsible for implementation and collection of the shortage in accordance with any allocation order entered.  

After all motions to exclude had been resolved, the receiver filed a motion for entry of a final order on allocation, to which a copy of the proposed final order was attached.  The receiver also filed its report on calculation of the allocation percentage and informed the court and the parties of its intent to use the March 1999 account balances for valuation based on the trial court's prior exclusion of all accounts opened after April 23, 1999.  Account holders thereafter filed objections to the proposed final order.

On February 26, 2000, for the first time, account holders filed a motion to continue consideration of entry of the final order until issues related to a potential conflict of interest of the receiver's attorney were addressed, seeking a continuance until they had an opportunity to pursue certain limited discovery with respect to the conflict of interest.  The basis of the motion was centered on the fact that the receiver had originally recommended allocating the shortage only to cash account holders, but later had a "change of heart" and recommended allocating the shortage to all account holders.  According to the account holders, the receiver's attorneys had long, close ties to the commodity futures industry and the firm's approach to dealing with the allocation may have been influenced by that relationship.  Even more specifically, the motion contended that the law firm represented defendants in a federal lawsuit who were owners, directors, or officers of commodity futures brokers and that some of these individuals may have customers who had accounts at Intrust through which they conducted futures trading.   It was the account holders' position that the firm could not neutrally represent the receiver, as it was required to do, because it may be representing other parties with substantial economic interests in the outcome of the allocation process, namely, commodity futures brokers who stood to have their customers lose substantial amounts of investment monies due to the allocation.  Thus, to the extent that the firm had a direct or indirect relationship with brokers who maintained or whose clients maintained accounts at Intrust, the firm should be disqualified.  Consistent with the foregoing contention, a second group of account holders also filed a motion requesting a hearing on the receiver's attorney's potential conflict of interest.  These motions were denied following a hearing.

The trial court conducted at least two hearings on the proposed final order and on March 1, 2000, it entered the final order, which identified those accounts that would be excluded from the allocation.  The court specifically found that the notice and opportunity to be heard afforded to account holders was reasonable, adequate, and sufficient.  In addition, the trial court found it had jurisdiction and authority, pursuant to the Act, to allocate the shortage.  The court determined that the allocation was to be made among all accounts, with the exception of those it had excluded.  

To determine the amounts to which the 8.69 allocation percentage was to be applied, the reference date upon which the allocation should be premised was determined to be March 31, 1999.  If the balance for that date was unavailable, the reference date was moved back to December 1998.  If the balances for either of these dates was unavailable, the reference date for allocation was April 30, 2000.  Lastly, if none of these balances were available, alternative valuation dates were detailed.  Subsequent to entry of the final order, certain account holders filed motions to reconsider while other account holders filed notices of appeal.  The motions to reconsider were denied.  Allocation letters and statements were mailed to all account holders on May 1.  Subsequently, we denied appellants' motions to stay the trial court proceedings pending resolution of the appeals.

On August 24, Millennium informed the trial court that the $68.1 million shortage had been collected.  It requested that the trial court conduct a hearing to release the restrictions on accounts.
(footnote: 9)  On September 12, the supreme court denied appellants' motions for direct appeal and appellants' motions to stay.  However, pursuant to a supervisory order, the supreme court directed us to consider this appeal on an expedited basis.

On October 29, 2001, we entered a brief stay to November 19, 2001 and subsequently extended that stay to November 29, 2001.

ANALYSIS

Two general briefs were filed: one by the O'Brien group of account holders and a second by the Bommer group of account holders.
(footnote: 10)  Three special briefs were filed addressing specific types of accounts: one by the Abbott group, one by the Agabedis group, and one by Norman and Shirley Bard, 
pro se.

Each will be addressed and considered.

   I.  Jurisdiction and Due Process

The Bommer appellants contend that the trial court lacked jurisdiction to allocate the shortage.  They apparently attack both subject matter and personal jurisdiction, although their arguments are amorphous in their organization and characterization of the specific jurisdictional issues which they apparently sought to raise.  They generally contend that the issue of allocation is not properly before the trial court because the Act gives the court no authority or power to allocate.  According to appellants, other traditional proceedings had to be undertaken, in particular, procedures under the Code of Civil Procedure (735 ILCS 5/1-101 
et seq.
 (West 1998)), that were not taken.  Specifically, appellants contend that the receiver was required to file a complaint against each of the 17,000 account holders and serve summons upon them.  In a related argument, appellants argue that they were not afforded due process guarantees because the notice and opportunity to be heard were insufficient.  Again, appellants argue that due process requires a complaint and summons against them individually as well as additional hearings.  We disagree with appellants that the circuit court lacked either subject matter jurisdiction or personal jurisdiction and further disagree that they were not provided with constitutional due process.

A.  Subject Matter Jurisdiction

The crux of appellants' argument appears to be that, other than the fact the Act does not authorize allocation, the attempt to intrude into their individual accounts is an intrusion into their individual property rights and, therefore, for the circuit court to have jurisdiction over their accounts, a complaint must be filed against each account holder individually.

Subject matter jurisdiction is the power of the court to decide a class of cases to which the case in question belongs.  3 R. Michael, Illinois Practice §2.1, at 10 (1989); 
In re Estate of Gebis
, 186 Ill. 2d 188, 192, 710 N.E.2d 385 (1999).  The determination is made based on the nature of the case and the relief sought.  3 R. Michael, Illinois Practice §2.1, at 10 (1989); 
Gebis
, 186 Ill. 2d at 192.  Illinois circuit courts are courts of general jurisdiction and have jurisdiction over all justiciable controversies except for three situations not relevant here.  3 R. Michael, Illinois Practice §2.1, at 11 (1989); Ill. Const. 1970, art VI, §9.  With respect to any particular case, subject matter jurisdiction is the power of the court to hear and determine the controversy presented to it.  
City of Chicago v. Chicago Board of Education
, 277 Ill. App. 3d 250, 261, 660 N.E.2d 74 (1995).  "The pleadings of the parties frame the issues in controversy and circumscribe the relief that the court is empowered to order."  
City of Chicago
, 277 Ill. App. 3d at 261. 

First, we find that the complaint filed by the Commissioner brought the issue of allocation before the trial court.  The complaint for dissolution of Intrust alleged that Intrust did not have control over a significant amount of assets deposited with other entities for the benefit of the beneficiaries and that Intrust did not have sufficient capital to replace those beneficial assets and, therefore, was unable to return such assets.  The Commissioner sought the following relief: (1) invocation of the trial court's jurisdiction pursuant to section 6-9 of the Act to adjudicate the validity of claims against Intrust; (2) invocation of jurisdiction pursuant to sections 6-4 and 6-11 of the Act to consider and adjudicate petitions for aid, relief, or authority; and (3) such other relief as was just and equitable.  

Although the Commissioner did not specifically mention the term "allocation of cash shortage" or seek specific authority to allocate such shortage, we find his complaint brought the deficiency, 
i.e.
, the cash shortage, forth as an issue in controversy.  The complaint explicitly stated that Intrust had insufficient money to return the fiduciary assets to their respective beneficiaries.  As such, the court would be required to determine how to deal with the deficiency and, ultimately, if Intrust had been dissolved, how to equitably distribute the money remaining at Intrust, 
e.g.
, allocation of the shortage.  Such determination would fall under the relief sought by the Commissioner either in the form of a petition for relief or as "such other relief as is just and equitable."  Such a determination would necessitate the exercise of the court's power over the individual fiduciary accounts to facilitate the relief requested.

Moreover, we find that the Act itself provides the trial court with authority over individual accounts and the power to allocate any cash shortage.  The Act is the foundation for initiating and conducting the liquidation proceeding and covers any issues incident thereto.  According to the Act, "[t]he proceedings pursuant to this Article 6 [entitled 'Receiver and Involuntary Liquidation'] shall be the exclusive remedy and the only proceedings commenced in any court for the dissolution or the winding up of the affairs [of a corporate fiduciary] or for the appointment of a receiver for any corporate fiduciary."  205 ILCS 620/6-1 (West 1998).  The Commissioner has the power when he deems it necessary to take control of the corporate fiduciary, its assets and the assets held for its beneficiaries to examine, reorganize, and liquidate.  205 ILCS 620/6-2(a)(4) (West 1998).  

The Act provides that the Commissioner has the power to continue or discontinue the corporate fiduciary (205 ILCS 620/6-5(1) (West 1998)), restore the corporate fiduciary to its board of directors (205 ILCS 620/6-5(10) (West 1998)), reorganize the corporate fiduciary (205 ILCS 620/6-5(11) (West 1998)), or liquidate the corporate fiduciary (205 ILCS 620/6-5(12) (West 1998)).  If the Commissioner determines that there is no possibility of reorganization, he shall file a complaint for dissolution or winding up of the affairs of the corporate fiduciary and for appointment of a receiver or such other proceedings as are appropriate under the circumstances of the particular case.  205 ILCS 620/6-4(a) (West 1998).  See also 205 ILCS 620/6-9 (West 1998) (the Commissioner is to appoint a receiver if it determines that reorganization is not possible and that the company should be liquidated through receivership).  Once such a complaint is filed, "[t]he court where the cause is docketed shall be vested with jurisdiction to hear and determine all issues and matters pertaining to or connected with the Commissioner's possession and control of such corporate fiduciary as provided in this Act, and such further issues and matters pertaining to or connected with the Commissioner's possession and control as may be submitted to such court for its adjudication by the Commissioner."  205 ILCS 620/6-4(a) (West 1998).  Subsequent to its appointment, the receiver is given the power, 
inter alia
, to cause all assets of the beneficiaries to be registered in its name or that of its nominee.  205 ILCS 620/6-10(12) (West 1998).

Section 6-1 clearly provides that Article 6 of the Act is the exclusive remedy for dissolution or winding up of a corporate fiduciary and, as such, appellants' contention that the receiver was required to proceed by way of separate complaints to join the individual account holders under the Code of Civil Procedure is not persuasive.  Moreover, section 6-4 provides the court with authority over all issues and matters pertaining to or in connection with the Commissioner's possession as well as to any other matters submitted to it.  As such, the trial court is given broad discretion to deal with any issue attendant to the receivership.  In order to liquidate or wind up the affairs of a corporate fiduciary, the assets of the company and the assets of the beneficiaries must be marshaled.  

Thus, the legislature has provided that a single court is to exclusively oversee all issues with respect to a liquidation.  It recognizes that it is essential for orderly disposition of the proceeding that the title, custody, and control of the assets be placed in a single management entity under the supervision of one court.  See 205 ILCS 620/6-1 (West 1998).  Were the receiver required to institute separate proceedings against each account holder it would be in direct contradiction to the express provisions of the Act that exclusive jurisdiction lies thereunder.  It would also unnecessarily and wastefully dissipate the already limited funds of Intrust, particularly in light of the fact that 17,000 complaints would have to be filed.  See 
People ex rel. Barrett v. West Side Trust & Savings Bank of Chicago
, 362 Ill. 607, 617-18, 1 N.E.2d 81 (1936) (object of liquidation--speedy termination with a minimum of expenses--would be defeated if interested parties were compelled to resort to a different tribunal to litigate matters related to the liquidation proceeding).  Accordingly, appellants' argument must be rejected.  The determination of all questions in one court promotes a fair, orderly, efficient, and economical proceeding to all interested parties.
(footnote: 11)
 Moreover, arguably, the Commissioner (or receiver) has power over the individual fiduciary accounts under two additional provisions of the Act.  By virtue of their power over the fiduciary accounts, the trial court necessarily obtains jurisdiction over them.

Pursuant to section 6-2, if the Commissioner finds that the capital of a corporate fiduciary is impaired or in an unsound condition, the Commissioner, after notice to the corporate fiduciary's board and failure of the board to rectify the situation, is authorized to "take possession and control of the corporate fiduciary, its assets, and assets held for beneficiaries of its fiduciary obligations, as in this Act provided for the purpose of examination, reorganization or liquidation through receivership."  205 ILCS 620/6-2 (West 1998).  This section gives the Commissioner authority and power over both the corporate accounts and the fiduciary accounts.  Under this section, the Commissioner has the power to examine, reorganize, or liquidate not only the corporate fiduciary itself, but also the individual fiduciary accounts in the receivership proceedings.  Accordingly, the Commissioner has power to reach the individual fiduciary accounts and in the course of the receivership proceedings can allocate any shortage to such accounts either in effectuating a reorganization or liquidation of such accounts and the corporate fiduciary.

Similarly, pursuant to section 6-5, when the Commissioner takes possession and control of a corporate fiduciary and its assets, he is vested with the "power to stop or limit the payment of its obligations."  205 ILCS 620/6-5(2) (West 1998).  With respect to the fiduciary accounts, Intrust has a duty to ensure that the total value of assets held by a particular account holder exist in the account.  Where there is any deficiency or shortage, Intrust has a duty to restore that deficiency from its general assets.  As a result, any claims of the account holders are obligations owed by Intrust as a debtor.  Pursuant to subsection 6-5(2), upon the Commissioner's taking possession, it can limit these obligations.  In other words, if the assets in the accounts are deficient and the corporate assets are insufficient to satisfy the total amounts claimed held in the fiduciary accounts, the Commissioner can, in an effort to disburse and liquidate the corporate fiduciary, limit the obligation or allocate any shortage among the fiduciary accounts.  Accordingly, the Commissioner has power to reach individual fiduciary accounts under his general management powers.  The court is granted authority pursuant to the Act to oversee these proceedings and, therefore, has power to allocate as well.

Generally, the purpose of a liquidation or winding up of a corporation is to distribute the assets remaining with the corporation to those entities or individuals entitled to receive them.  
Fleckner v. President, Directors
, 21 U.S. (8 Wheat.) 338, 362, 5 L. Ed. 631, 636 (1823); 
In re 203 North LaSalle Street Ltd. Partnership
, 190 B.R. 567, 584 (N.D. Ill. 1995), 
rev'd on other grounds
, 526 U.S. 434, 143 L. Ed. 2d 607, 119 S. Ct. 1141 (1999).  In other words, the assets of the corporation must be marshaled and reduced to cash, all accounts must be settled, and any surplus or loss must be divided.  See Black's Law Dictionary 930 (6th ed. 1990); 
Fleckner
, 21 U.S. (8 Wheat.) at 362, 5 L. Ed. at 637; 
United States v. Metcalf
, 131 F.2d 677, 679 (9th Cir. 1942).  To do so, the court (or appropriate party under the court's supervision) must ascertain what assets exist including both the assets of the corporate fiduciary and the assets held for the benefit of account holders.  
Metcalf
, 131 F.2d at 679. The court must also ascertain what assets are missing, if any, and from what source, if possible.  After determining the total amount of assets available for distribution, the court must determine who is entitled to distribution and in what amounts.  
Metcalf
, 131 F.2d at 679; 
Farmers State Bank & Trust Co. v. Brady
, 137 Tex. 39, 43, 152 S.W.2d 729, 732 (1941).

If the assets available are insufficient to satisfy all those entitled to a disbursement, the court must allocate any shortage among the beneficiaries to ascertain who is entitled to what amount once the remaining assets are converted to cash for distribution.  Clearly, these determinations, evaluations, and assessments are issues and matters relevant to the Commissioner's possession.  As such, in liquidation proceedings, if the assets are insufficient to satisfy all trust beneficiaries, the trial court must necessarily have the authority under established equitable principles to provide for 
pro rata
 distribution in an amount less than the amount the corporate fiduciary was supposed to be holding for them, among them, 
i.e.
, it must allocate the shortage of total assets available for distribution on an equitable basis.  If the trial court lacked such authority, it could not accomplish the goal of the liquidation as it would not be able to settle the corporation's accounts and dissolve it.  See generally 
Woodhouse v. Crandall
, 197 Ill. 104, 64 N.E. 292 (1902).

In the instant case, instead of liquidating Intrust outright, the court (and receiver) made an attempt to preserve the accounts as fiduciary accounts, albeit under different ownership.  These accounts were not dissolved and, thus, no actual 
pro rata
 disbursement was made to beneficiaries.  Instead, the focus was on a 
pro rata
 allocation without the actual liquidation of those accounts.  In contrast to a comprehensive disbursement situation, the trial court here had to allocate the missing funds among various accounts.  The determination of this issue was a matter pertaining to the Commissioner's possession of the corporate fiduciary and the receivership.  As such, in determining how to resolve the issue of the shortage, the trial court must necessarily have authority to allocate it.  This power to allocate is inherent in the court's right under section 6-4 to oversee the liquidation proceeding initiated by the Commissioner and implemented by the receiver under the Act.  Since the trial court had subject matter jurisdiction, the only question now is whether the mandates of due process were satisfied.

B.  Personal Jurisdiction/
In Rem
 Jurisdiction

The Bommer group contends that due process considerations require personal service of summons and process upon each account holder.  We do not agree.
(footnote: 12)  Personal jurisdiction pertains to the authority of the court to litigate in reference to a particular defendant and to determine the rights and duties of that defendant. 3 R. Michael, Illinois Practice §2.1, at 10 (1989).  It is black letter law that the alternative to personal jurisdiction is 
in rem
 jurisdiction or 
quasi in rem
 jurisdiction.  3 R. Michael, Illinois Practice §3.1, at 23 (1989); 
Poplar Grove State Bank v. Powers
, 218 Ill. App. 3d 509, 515, 578 N.E.2d 588 (1991).  This form of jurisdiction is concerned with the relationship between defendant and the state with respect to specific property held by the defendant.
  Personal jurisdiction over a party is not required where the court is given jurisdiction over the property against which a judgment is sought to be enforced.  3 R. Michael, Illinois Practice §7.1, at 79 (1989); 
Poplar Grove State Bank
, 218 Ill. App. 3d at 515.  
In rem
 jurisdiction exists when a cause of action is related to the property that is subject to the jurisdiction of the court.  
Quasi in rem
 jurisdiction exists when the property of defendant is subject to the jurisdiction of the court but the cause of action does not directly relate to that property.  3 R. Michael, Illinois Practice §7.1, at 78 (1989).  All forms of non-subject-matter jurisdiction require: (1) a constitutional basis to assert jurisdiction (
Pennoyer v. Neff
, 95 U.S. 714, 24 L. Ed. 565 (1878)) and (2) adequate notice to defendant (
McDonald v. Mabee
, 243 U.S. 90, 61 L. Ed. 608, 37 S. Ct. 343 (1917)).

Initially, appellants have waived the right to contest personal jurisdiction, service of process, and the court's 
in rem
 jurisdiction.  It is again Hornbook law that to challenge the court's jurisdiction over person or property, a party must file a special and limited appearance and must limit his participation solely to the jurisdictional challenge.  
In re Estate of Zoglauer
, 229 Ill. App. 3d 394, 397, 593 N.E.2d 93 (1992); 
Farley v. Blackwood
, 56 Ill. App. 3d 1040, 1044, 372 N.E.2d 921 (1978).  This special appearance (or motion to dismiss) must be filed prior to filing any other pleading or motion and must be made for the sole purpose of objecting to jurisdiction.  735 ILCS 5/2—301(a) (West 1998); 
In re Marriage of Snider
, 305 Ill. App. 3d 697, 699, 712 N.E.2d 947 (1999).  Both requirements are strictly construed.  A party who appears generally in an action may not later attack jurisdiction and waives any jurisdictional objection.  
Blackwood
, 56 Ill. App. 3d at 1044.  If a party participates in the proceeding on its merits, even after a special appearance has been filed, that party waives the special appearance and jurisdictional challenge when he takes such affirmative action dealing with substantive issues thereby amounting to a general appearance and submitting himself to the jurisdiction of the court.  
Snider
, 305 Ill. App. 3d at 699; 
In re Marriage of Adler
, 271 Ill. App. 3d 469, 474, 648 N.E.2d 953 (1995); 
Morey Fish Co. v. Rymer Foods, Inc.
, 240 Ill. App. 3d 61, 67, 608 N.E.2d 74 (1992), 
rev'd on other grounds
, 158 Ill. 2d 179, 632 N.E.2d 1020 (1994); 
Zoglauer
, 229 Ill. App. 3d at 397; 
Blackwood
, 56 Ill. App. 3d at 1044.  The rationale for this rule is that a party who contests the authority of the court to hear the matter cannot be deemed to recognize the court's authority to decide any facet of the controversy.  3 R. Michael, Illinois Practice §10.2, at 120 (1989); 
Snider
, 305 Ill. App. 3d at 699.

In the instant case, appellants did not file a special appearance or otherwise challenge the jurisdiction of the trial court.  Even assuming they did, appellants nonetheless have waived any right asserted and subjected themselves to the jurisdiction of the court by filing their objections and motions to exclude, seeking the court's substantive resolution of the merits.  Appellants clearly argued and sought an adjudication of the merits.  As such, they cannot now attack the trial court's jurisdiction or lack of service on them.  What appellants essentially did was to intervene 
de facto
 without objection to jurisdiction.  They became involved in the proceedings to ensure their interests were adequately protected and participated thereafter as parties.  
Kemp-Golden v. Department of Children & Family Services
, 281 Ill. App. 3d 869, 872-73, 667 N.E.2d 688 (1996).  Accordingly, appellants have waived any jurisdictional objections.

The right to proceed against the individual accounts under the enabling provisions of the Act may well stem from the court's jurisdiction over the property itself, which provides the court with 
in rem
 or 
quasi in rem
 jurisdiction. 

"An 'action in rem' is a proceeding that takes no cognizance of owner but determines right in specific property against all of the world, equally binding on everyone.  [Citation.]  It is true that, in a strict sense, a proceeding 
in rem
 is one taken directly against property, and has for its object the disposition of property, without reference to the title of individual claimants' but, in a larger and more general sense, the terms are applied to actions between parties, where the direct object is to reach and dispose of property owned by them, or of some interest therein.  ***  In the strict sense of the term, a proceeding '
in rem
' is one which is taken directly against property or one which is brought to enforce a right in the thing itself."  Black's Law Dictionary at 713 (5th ed. 1979).

In rem
 or 
quasi in rem
 proceedings do not require personal service of process.  
Mullane v. Central Hanover Bank & Trust Co.
, 339 U.S. 306, 312, 94 L. Ed. 865, 872, 70 S. Ct. 652, 656 (1950); 
People ex rel. Hanrahan v. One 1965 Oldsmobile
, 52 Ill. 2d 37, 45, 284 N.E.2d 646 (1972), 
rev'd on other grounds
, 409 U.S. 38, 34 L. Ed. 2d. 47, 93 S. Ct. 30 (1972); 
Bickerdike v. Allen
, 157 Ill. 95, 100, 41 N.E. 740 (1895).

Receiverships and liquidations have been held, under Illinois law, to be 
in rem
 proceedings.  See 
Blackhawk Heating & Plumbing Co. v. Geeslin
, 530 F.2d 154, 158 (7th Cir. 1976); 
Katin v. Apollo Savings
, 460 F.2d 422, 424 (7th Cir. 1971); 
Federal Savings & Loan Insurance Corp. v. Krueger
, 435 F.2d 633, 636 (7th Cir. 1970).  See also 
Pastor v. National Republic Bank of Chicago
, 76 Ill. 2d 139, 152, 390 N.E.2d 894 (1979) (holding that New York proceeding in which an insurance company was placed in liquidation was a proceeding 
in rem
 and therefore the fact that the plaintiff was not a party to the New York proceeding, nor given an opportunity to be heard, did not deny him due process where the liquidator was permitted to draw against a letter of credit procured by the plaintiff).  See also 
Bartlett v. Cicero Light, Heat & Power Co.
, 177 Ill. 68, 77, 52 N.E. 339 (1898) (holding that a judgment against a receivership was in the nature of a judgment 
in rem
).  It is the disposition of the property held by Intrust, including that property of the individual account holders, whose undisputed situs was in Illinois, that was before the trial court.  When initiated, the direct object of the liquidation proceeding was to reach the property of Intrust and the account holders and to distribute it and settle each account holders' interest.  The liquidation was brought to enforce various parties' rights in the property held by Intrust, then in the possession of the Commissioner.  Moreover, the relief sought by appellants, 
i.e.
, the turnover of "their" noncash assets to them, specifically sought to have the court determine the extent of their entitlement to the funds and assets held in their accounts.  This claim would be sufficient in and of itself to involve the 
in rem
 or, in the alternative, the 
quasi in rem
 powers of the court.  
Blackhawk Heating & Plumbing Co.
, 530 F.2d at 158.  The trial court's jurisdiction was entirely dependent upon the location of the corporate and trust assets in Illinois. 
 
See 
Mullane
, 339 U.S. 306, 94 L. Ed. 865, 70 S. Ct. 652.

Based on the foregoing, even though appellants were not personally named and served, under the principles of 
in rem
 jurisdiction, they were bound by the decision of the trial court.  See 
Safeco Insurance Co. of Illinois v. Treinis
, 238 Ill. App. 3d 541, 545, 606 N.E.2d 379 (1992).  See also 
Federal Trade Comm'n v. Productive Marketing, Inc.
, 136 F. Supp. 2d 1096, 1106 (C.D. Cal. 2001) (in 
in rem
 cases, the courts have inherent authority to enforce their orders against nonparties).  However, although the trial court had subject matter jurisdiction and 
in rem
  or 
quasi in rem
 jurisdiction over the 
res
, appellants nonetheless are entitled to due process guarantees of adequate notice and an opportunity to be heard.

C.  Due Process Considerations

Appellants appear to contend that independent of any jurisdictional consideration they were denied important property interests without adequate notice and an opportunity to be heard.  With respect to notice, appellants reiterate their argument that the Code of Civil Procedure requires the receiver to file a complaint against each of them and serve them with process.
(footnote: 13)  With respect to the opportunity to be heard, appellants appear to argue that they were entitled to more hearings both larger in number and scope.  We disagree with appellants in each of these respects.

Even where the court properly possesses jurisdiction over the subject matter and over the property itself (the 
res
), due process principles require that one cannot be deprived of property without adequate notice and an opportunity to defend.  3 R. Michael, Illinois Practice §8.1, at 83 (1989); 
City of Marseilles v. Union Bank
, 317 Ill. App. 3d 931, 934, 741 N.E.2d 333 (2000).  Due process is a "flexible concept and specific procedural requirements with respect to notice and opportunity to be heard vary, depending upon the character of the rights affected and the degree of the deprivation."  
Stillo v. State Retirement Systems, 
305 Ill. App. 3d 1003, 1009, 714 N.E.2d 11 (1999).

The leading case on notice and due process requirements where, as here, personal service is not a prerequisite is 
Mullane
.  The issue before the 
Mullane
 Court was the adequacy of notice by publication to beneficiaries of a common trust fund when the trustee petitioned the court for a judgment settlement of the common account.  The Court concluded that publication notice to missing beneficiaries or beneficiaries whose addresses or interests were unknown was adequate.  
Mullane
, 339 U.S. at 317, 94 L. Ed. at 875, 70 S. Ct. at 659.  However, notice by publication to those beneficiaries whose addresses were known to the trustee was not constitutionally adequate; notification by ordinary mail was required for such individuals.  
Mullane
, 339 U.S. at 318, 94 L. Ed. at 875, 70 S. Ct. at 659.  In 
Mullane
, small trusts were pooled by Hanover Bank & Trust Company, a New York-based company, into one common fund for administration by the trustee.  Hanover petitioned the court, pursuant to statute, for settlement of the account.  At the time of the petition, there were approximately 113 trusts in the account, valued at over $3 million.  Some of the trust beneficiaries were nonresidents of New York.  Notice of Hanover’s application was given by publication in a local New York newspaper in compliance with state law.  
Mullane
, 339 U.S. at 309, 94 L. Ed. at 870-71, 70 S. Ct. at 655.  Additionally, at the time an individual opened an account with Hanover, he or she was given a copy of the statute with respect to notice requirements in connection with any judicial settlement.  
Mullane
, 339 U.S. at 310, 94 L. Ed. at 871, 70 S. Ct. at 655.  A special guardian and attorney was appointed for the beneficiaries in the settlement proceeding, who appeared and specifically objected to the adequacy of notice.  
Mullane
, 339 U.S. at 311, 94 L. Ed. at 871, 70 S. Ct. at 655.  The trial court concluded that notice was sufficient.  
Mullane
, 339 U.S. at 311, 94 L. Ed. at 871, 70 S. Ct. at 655.  Thereafter, the trial court entered an order with respect to settlement of the fund, which order, 
inter alia
, the Supreme Court recognized as terminating the rights of any beneficiary to object to improper management by the trustee.  
Mullane
, 339 U.S. at 311, 94 L. Ed. at 871-72, 70 S. Ct. at 656; 
First National Bank of Winnetka v. Alleman
, 115 Ill. App. 3d 224, 226, 450 N.E.2d 760 (1983); 
Elmhurst Stamping & Manufacturing Co. v. Amax Plating, Inc.
, 67 Ill. App. 3d 257, 260, 384 N.E.2d 839 (1978).

The Supreme Court, in response to appellants' argument that the trial court lacked personal jurisdiction over them due to insufficiency of notice, noted that the distinction between personal jurisdiction and 
in rem
 proceedings was old, but now confused due to new forms of proceedings.  
Mullane
, 339 U.S. at 312, 94 L. Ed. at 872, 70 S. Ct. at 656.  It then noted that courts differed on classification of proceedings to settle fiduciary accounts, some finding such proceedings to be 
in rem
, some finding such proceedings to be 
quasi in rem
, and some finding such proceedings in the nature of 
in rem
.  
Mullane
, 339 U.S. at 312, 94 L. Ed. at 872, 70 S. Ct. at 656.  The Court, however, did not believe that due process requirements were dependant upon a particular classification of a proceeding as requiring personal jurisdiction or 
in rem
 jurisdiction.  Rather, the particular notice procedures adopted by a state where it sought to deprive one of life, liberty, or property must "accord[] full opportunity to appear and be heard" appropriate to the nature of the case.  
Mullane
, 339 U.S. at 313, 94 L. Ed. at 872, 70 S. Ct. at 656.  

Well-established general principles guided the Court’s consideration of the adequacy of notice: 

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations.]  The notice must be of such nature as reasonably to convey the required information [citation], and it must afford a reasonable time for those interested to make their appearance [citations].  But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied.  'The criterion is not the possibility of conceivable injury but the just and reasonable character of the requirements, having reference to the subject with which the statute deals.' [Citations.]" 
Mullane
, 339 U.S. at 314-15, 94 L. Ed. at 873-74, 70 S. Ct. at 657.

See also 
In re Application of Rosewell
, 117 Ill. 2d 479, 487, 490, 512 N.E.2d 1256 (1987); 
Hanrahan
, 52 Ill. 2d at 45;
 
Gibbs v. Estate of Dolan
, 146 Ill. App. 3d 203, 207, 496 N.E.2d 1126 (1986).  Additionally, "[t]he reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected [citations], or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes."  
Mullane
, 339 U.S. at 315, 94 L. Ed. at 874, 70 S. Ct. at 657-58.  In evaluating the reasonableness of notice, the State’s interests must be balanced against the beneficiaries’ interest in being heard which "right *** has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest."  
Mullane
, 339 U.S. at 314, 94 L. Ed. at 873, 70 S. Ct. at 657.  

The Court then commented that it had not previously committed itself to any one formula for notice and that while personal service had always been found adequate, the Court had not always required personal service--due process cannot justify placing impossible or impracticable obstacles upon the state.  
Mullane
, 339 U.S. at 313-14, 94 L. Ed. at 873, 70 S. Ct. at 657.  See also 
Rosewell v. Chicago Title & Trust Co.
, 99 Ill. 2d 407, 412, 459 N.E.2d 966 (1984); 
Hanrahan
, 52 Ill. 2d at 46.  However, oftentimes, the Court had found publication/constructive notice insufficient because the notice was in small type in the back of newspapers, which even locals would not see, the odds that individuals outside the area would ever see such notice was slight, and the notice did not name those individuals whose attention it was supposed to draw.  
Mullane
, 339 U.S. at 315, 94 L. Ed. at 874, 70 S. Ct. at 658. 

Based on the considerations identified above, the Court concluded that personal service of the citation or petition for settlement of the account upon the known as well as unknown beneficiaries was not necessary, stating:

"[The] type of trust [before the Court] presupposes a large number of small interests.  The individual interest does not stand alone but is identical with that of a class.  The rights of each in the integrity of the fund and the fidelity of the trustee are shared by many other beneficiaries.  Therefore notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all since any objection sustained would inure to the benefit of all.  We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable."  
Mullane
, 339 U.S. at 319, 94 L. Ed. at 876, 70 S. Ct. at 659-60.

Thus, 
Mullane
 concluded that in no event was personal service required under any due process considerations.  It further concluded that notice by publication was sufficient with respect to unknown beneficiaries while more was required for known beneficiaries because publication alone was "not reasonably calculated to reach those who could easily be informed by other means at hand."  
Mullane
, 339 U.S. at 319, 94 L. Ed. at 876, 70 S. Ct. at 660.

In the instant case, both actual and constructive notice was provided to account holders.  Constructive notice came in the form of publication of pleadings, orders, the receiver’s recommendations, 
etc.
 on Intrust’s website.
(footnote: 14)  Detailed information with respect to the proceedings was maintained on the website.  However, we need not decide if notice via the Internet is in itself constitutionally sufficient because we conclude that actual notice was afforded to individual account holders, in conjunction with Internet publication, which was sufficient to satisfy the requirements of due process.

On April 17, 2000, each of the 17,000 account holders was mailed a letter by first class mail.  The letter advised the account holders that the Commissioner had taken possession of Intrust, Intrust was involved in receivership proceedings, and a receiver had been appointed.  The letter stated that all funds held by Intrust were in the possession, control, and under the supervision of the receiver.  Account holders were advised that a substantial portion of cash placed with a third-party entity was missing and it was the priority of the receiver to determine the amount of money missing and how the beneficiaries would be affected by the missing cash.  The letter expressed that the receiver could not currently calculate any loss to a particular account and, as such, restrictions were placed on all accounts.  Account holders were informed that no formal claim filing procedure was yet in existence but they would be notified as soon as a procedure was in place.  Lastly, the letter stated:

"As the cost of sending written communications to each customer and interested party is quite substantial, it is anticipated that letters such as this will be made in conjunction with the mailing of account statements.  For more frequent updates, please visit [Intrust’s] web site at 
www.intrust.com.
"

Additionally, on June 14, 2000, each of the 17,000 account holders was mailed a notice by first class mail.  The notice was also published on Intrust’s website.  This notice informed account holders that a hearing to determine the allocation of the cash shortage and implementation of the allocation was scheduled for July 28, 2000.  The time and location were also identified.  Account holders were advised that the receiver was preparing its recommendation which would be filed with the court and posted on Intrust’s website by June 23.  If any account holder did not have access to the Internet, the notice instructed the account holder to submit in writing to the receiver that he or she did not have access to the Internet and would like a copy of the recommendation to be sent to him or her by mail.  In such circumstances, the receiver would send, by first class mail, a copy of its recommendation.  The notice also instructed the account holders that at the hearing, the trial court would consider the receiver’s recommendation, hear evidence, and issue a determination.  Account holders were specifically informed that the trial court’s determination would be binding upon all of them and that such determination may affect their right to assets in their accounts.  The notice then notified the account holders that the court had directed that any objections or responses to the receiver’s recommendation, along with any arguments or positions the account holders wanted the court to consider, should be filed with the court, in writing, by July 14.

We find that the mailings of April 17 and June 14 to all account holders satisfied the requirements of due process.  First, communications with respect to the nature of the proceedings, the means of obtaining updated information, and the means by which to access and personally participate in the proceedings were mailed by first class mail, which is deemed to be adequate notice by Illinois courts and the United States Supreme Court.  
Guerrero v. Ryan
, 272 Ill. App. 3d 945, 949, 651 N.E.2d 586 (1995); 
Mullane
, 339 U.S. at 318, 94 L. Ed. at 875, 70 S. Ct. at 659.  The first letter reasonably conveyed to the account holders the problems at Intrust and that their accounts were involved.  The second letter informed account holders of the purpose of the hearing, the fact that their accounts would be affected, and how they might intervene in the court proceedings.  It provided adequate notice of the purpose of the hearing and a reasonable time for them to make their appearances.  Moreover, the account holders were advised that upon their request they would be kept further informed by first class mail if they lacked Internet access.  Both mailed communications were plain to understand.  In the instant case, the cost of personally serving 17,000 account holders with notice of every step in the proceeding would not only be impractical, but probably economically unfeasible.  

In sum, we find that mailing notice with respect to the liquidation proceeding and allocation hearing by first class mail to each account holder was reasonably calculated, under the circumstances of this case, to apprise them of the pendency of the action in which their interests would be affected and provided them reasonable opportunity to appear.

With respect to the opportunity to be heard, the Supreme Court in 
Mathews v. Eldridge
, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976), set forth criteria to evaluate whether particular procedural safeguards are met.  These considerations are: "(1) the private interest that will be affected by the government's action; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value, if any, of additional procedures; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional procedural requirement would entail."  
Stillo
, 305 Ill. App. 3d at 1009, citing 
Mathews
, 424 U.S. at 335, 47 L. Ed. 2d at 33, 96 S. Ct. at 903.

In the instant case, account holders had a strong interest in protecting the integrity of their assets invested in the trust accounts but they were afforded ample opportunity to participate in the court's proceeding so as to minimize any risk of erroneous deprivation.  Account holders were given the opportunity to file extensive pleadings with respect to the issues raised in the liquidation proceeding, including objections and suggestions with respect to the receiver's initial recommendation, replies to the receiver's response to objections, objections to the receiver's fee requests, motions to exclude, supplements to motions to exclude, evidence in support of motions to exclude, objections and oppositions to the proposed final order, and objections and oppositions to the report calculating the allocation percentage.  Account holders were also afforded the opportunity to take the receiver's deposition.  As the receiver comments, account holders raised every conceivable challenge to the allocation process and allocation method and computation.  

Moreover, the trial court conducted extensive hearings, both in quantity and length, on the objections raised by the account holders.  At each of these hearings, account holders were afforded the opportunity to present arguments or suggestions to the court and, at many, to present evidence to support their positions.  Over the course of the proceedings, the trial court considered numerous allocation methods presented by the receiver and by the account holders.  The benefits and detriments of each were thoroughly argued, explored, and examined.  Given the circumstances present and the necessity to resolve the matter as expeditiously as possible, the hearings were sufficient.  Moreover, we believe that, even in the absence of consideration given to the necessity to resolve the matter expediously, the trial court provided account holders with an adequate opportunity to be heard and that additional hearings or proceedings would not have provided any significant additional safeguards.  

Finally, under 
Mathews
, 
the interests of the public must be considered.  "This factor involves an examination of the relevant fiscal and administrative burdens, and also a determination as to when judicial procedures must be imposed *** to assure fairness."  
Stillo
, 305 Ill. App. 3d at 1010.  Here, the overriding governmental and public interest in the liquidation proceeding was to protect the interests of the accounts holders and the investing public at large and to efficiently, expediently, and in an orderly manner resolve the matter.  The fiscal and administrative burden of conducting 5,000 individual motions to exclude or delving into the particularities of each of the individual account holders' circumstances, particularly when many of the account holders were in the same class of investments with similar facts or issues in common, would be burdensome.  Rather, the procedures utilized by the trial court, specifically in reference to the exemplar motions, avoided piecemeal litigation, potentially conflicting rulings, and efficiency.  Had individual hearings been had, an unnecessary waste of the remaining assets of Intrust would likely have occurred along with the incurrence of additional receiver fees and expenses.  Lastly, the expedient resolution was significant to account holders so that the restrictions on their accounts could be lifted and access thereto obtained.  We do not believe that additional procedural safeguards were necessary to satisfy due process. 

In conclusion, we find that account holders were afforded the due process guarantees of adequate notice and an opportunity to be heard.

D.  Loss of Jurisdiction

 Appellants alternatively maintain that even if the trial court originally had jurisdiction and properly exercised it, the trial court lost jurisdiction when Intrust was sold to Millennium.  According to appellants, the Act does not authorize the trial court to exercise continuing jurisdiction once a successor trustee takes over because the receiver loses its power and authority.  We do not agree.

Pursuant to section 6-10(6) of the Act:

"As soon as can reasonably be done, the receiver shall resign on behalf of the corporate fiduciary, all trusteeships, guardianships, and all appointments as executor and administrator, *** or as fiduciary under custodial or agency agreements or under the terms of any other written agreement or court order whereunder the corporate fiduciary is holding property in a fiduciary capacity for the benefit of another person, making in each case, from the records and documents available to the receiver, a proper accounting, in the manner and scope as determined by the Commissioner to be practical and advisable under the circumstances, on behalf of the corporate fiduciary.   The receiver, prior to resigning, shall cause a successor trustee or fiduciary to be appointed pursuant to the terms set forth in the governing instrument or pursuant to the provisions of the Trusts and Trustees Act, as now or hereafter amended, if applicable, then the receiver shall make application to the court having jurisdiction over the liquidation or winding up of the corporate fiduciary, for the appointment of a successor."  205 ILCS 620/6-10(6) (West 1998).

Section 6-10(16) provides:

"Upon the appointment of a successor trustee or fiduciary, the receiver shall deliver to such successor trustee or fiduciary all of the assets belonging to the individual trust or fiduciary account as to which the successor trustee or fiduciary succeeds, and the receiver shall thereupon be relieved of any further duties or obligations with respect thereto."  205 ILCS 620/6-10(16) (West 1998).

These provisions, relied upon by appellants, speak only to the receiver's duties in connection with the fiduciary trust accounts.  These provisions do not speak to the receiver's other duties related to the receivership proceedings.  Outside of managing and administering the trust accounts, the receiver has additional duties with respect to the corporate fiduciary, specifically, with respect to the assets of the corporate fiduciary itself.  Through the sale to Millennium, the receiver only transferred the trust accounts to a successor trustee.  Only the receiver's resultant duties and powers related to the trust accounts would have been terminated pursuant to section 6-10(16).  Its entire range of duties in connection with the receivership did not terminate. 

Thus, the receivership was not terminated and the court's jurisdiction over the receivership proceeding remained and remains ongoing. 

The only other provision of the Act that addresses termination of the receiver's duties is section 6-11.  This provision provides that "[a]t the termination of the receiver's administration, the receiver shall petition the court for the entry of a judgment of dissolution.  After a hearing upon such notice as the court may prescribe, the court may enter a judgment of dissolution whereupon the corporate fiduciary's corporate existence shall be terminated and the receivership concluded."  205 ILCS 620/6-11(6) (West 1998).  The receivership proceedings and the receiver's administration were not complete upon the sale to Millennium.  The receivership was still pending and Intrust had not been liquidated or dissolved.  In fact, Intrust still existed (and presumably still exists) as a corporate entity.  No order of dissolution had been entered pursuant to section 6-11(6).  
Although Millennium did purchase most of Intrust's corporate assets, the receiver was still in possession of some of the corporate assets, which required administration and liquidation.  For example, claims potentially remained against Intrust by its common creditors.  In addition, other matters with respect to the corporation's business, 
e.g.
, various lease agreements and litigation against Intercounty, were unresolved.  As such, we disagree with appellants that once Intrust was sold to Millennium the receiver lost power.  There were viable issues remaining, outside of any fiduciary duties in connection with the administration of trust accounts, that the receiver remained responsible to discharge. 

More overridingly, the section with respect to successor trustees was not designed to disrupt the proper administration of the liquidation proceedings and processes already begun.  The Act contemplates a full winding down of the corporation once a receivership proceeding has been commenced and entails completion of all necessary acts to wind down, including allocation of the cash shortfall.  In the instant case, the sale to Millennium was not the last act in the liquidation proceeding; it was only one step in the process.  At the time of the sale, the allocation of the shortfall was already in progress and the receiver had a duty to complete this process.  When Intrust's fiduciary accounts were transferred to Millennium thus terminating the receiver's ability to effectuate the allocation, Millennium was placed in the position held by the receiver prior to the sale.  The court was still left with the burden to conclude the allocation process and implement the method of allocation.  As such, Millennium was in no different position than the receiver 
vis-a-vis
 the trial court's duty to oversee and ultimately resolve the cash shortage.  Accordingly, the trial court did not lose jurisdiction of this matter upon sale to Millennium.

II.  Discovery Requests

Appellants (Bommer) contend that the trial court abused its discretion in refusing discovery.  Appellants sought discovery to determine whether certain accounts, 
i.e.
, those accounts in which account holders agreed to leave 30% of their deposits in cash with Intrust, were held as general deposits rather than special deposits, thus warranting different treatment.  Appellants' counsel maintained that he expected the discovery to show that there were groups of account holders who ought to be deemed to have assumed a greater risk of loss than others because they kept their deposits in cash.  After hearing argument, the court stated that it agreed that the discovery would probably show what appellants contended it would show.  However, the court stated that such evidence was irrelevant: "The Court remains of the view that when moneys were deposited, as soon as the allocations began, when the moneys were deposited and then withdrawn for whatever purpose, it was not just the money of the account holder that was withdrawn; it was bits and pieces of everybody else's money.  It was all commingled money.  The line of inquiry on which you seek discovery is, therefore, immaterial."  Thus, appellants' two requests for discovery were denied.  Basically, the trial court denied the requests for discovery on the basis of commingling.  

The trial court possesses broad discretion with respect to discovery.  
Castro v. Brown's Chicken & Pasta, Inc.
, 314 Ill. App. 3d 542, 554, 732 N.E.2d 37 (2000).  Discovery should be denied where there is insufficient evidence to show that the requested discovery is relevant.  
Dufour v. Mobile Oil Corp.
, 301 Ill. App. 3d 156, 160, 703 N.E.2d 448 (1998).  A reviewing court shall not disturb the trial court's ruling on discovery matters unless its decision is an abuse of discretion.  
Castro
, 314 Ill. App. 3d at 554.  An abuse of discretion exists where no reasonable person would take the position adopted by the trial court (
In re Marriage of Knoche
, 
322 Ill. App. 3d 297, 308, 750 N.E.2d 297 (2001)), or where the trial court acts arbitrarily, fails to employ conscientious judgment, and ignores recognized principles of law.  
Castro
, 314 Ill. App. 3d at 554.

Although the trial court's analysis was flawed in failing to distinguish between the priorities of special deposits as compared to general deposits and in failing to distinguish between the rights of account holders as general creditors and special account holders as trust beneficiaries, its result was nevertheless correct.  Appellants sought discovery to show that certain accounts were being held as general deposits, rather than special deposits.  "A general deposit makes the money deposited a part of the bank's general fund and makes the bank a debtor."  
Mid-City National Bank of Chicago v. Mar Building Corp.
, 33 Ill. App. 3d 1083, 1089, 339 N.E.2d 497 (1975).  In general, title to the money passes to the bank and it becomes a debtor to the extent of the deposit.  
Mid-City National Bank of Chicago
, 33 Ill. App. 3d at 1089.  Conversely, "[a] special deposit is the delivery of either money or chattel to a bank under a special agreement, or under circumstances sufficient to create a trust."  
Mid-City National Bank of Chicago
, 33 Ill. App. 3d at 1089.  "The deposit is for some specific purpose not contemplating a credit or a general account" and is one for safekeeping.  
Mid-City National Bank of Chicago
, 33 Ill. App. 3d at 1089.  With respect to special deposits, it is the duty of the bank to "hold for use of the depositor, not the identical bills or coins, but an equivalent sum to be kept intact or separated from the depositary's other funds."  
Durkee v. Franklin Savings Ass'n
, 17 Ill. App. 3d 978, 981, 309 N.E.2d 118 (1974), citing 
Woodhouse
, 
197 Ill. 104.

In the instant case, all funds held by Intrust were special deposits as a matter of law.  Intrust was a corporate fiduciary, 
i.e.
, a trust company, which could only exercise trust powers and execute only trusts.  205 ILCS 620/1-5.05 (West 1998); 205 ILCS 5/2 (West 1998).  It could accept funds only as a fiduciary of such funds for the benefit of the account holders; this included those funds that it accepted where it required the account holders to leave 30% of their deposits in cash--the only funds really at issue.  Intrust entered into contractual agreements with the account holders at the time of their deposits, which agreements, in general, provided that Intrust would act as a fiduciary and all amounts deposited were held in trust.  With respect to the 30% accounts, just as with any other deposit, title to this money did not pass to Intrust.  Rather, it remained with the account holders.  In addition, these account holders did not become creditors of Intrust with respect to the deposits.  Rather, the account holders remained entitled to return of the thing deposited with Intrust, 
i.e.
, equivalent funds.  There can be no dispute that all funds held by Intrust were special deposits.  As such, as the trial court concluded, discovery was neither necessary nor relevant.  Accordingly, the trial court did not abuse its discretion in denying appellants' requests for discovery.

III.  Receiver's Counsel's Potential Conflict of Interest 

Appellants (O'Brien and Bommer) contend that the trial court should have addressed the issue regarding the potential conflict of interest of the receiver's attorneys.  On February 25, 2001, they filed a motion for a hearing on the potential conflict.  The alleged conflict of interest was based on the receiver's attorneys' long-standing and close ties to the commodities futures industry and that the firm may be representing other parties in a federal lawsuit who had a substantial economic interest in the outcome of the allocation process.

On February 27, the trial court heard arguments from both counsel who filed the motions.  The receiver responded that appellants' motions were speculative and not based on fact. The movants speculated that there are certain classes of Intrust account holders who may do business with certain clients of the receiver's counsel in the commodities industry and, that, therefore, there may be a conflict of interest.  The receiver maintained that it was not aware of any such situation and if it became so aware, it would apprise the court.  The court in addressing the movants' request stated:

"[I]n the Court's 17 years I have not heard of a motion to request a hearing to address counsel's potential conflict of interest.

I have heard of motions to disqualify counsel.  This is not a motion to disqualify counsel.  It's denied."

Rule of Professional Conduct 1.7 provides:  

"(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client;  and

(2) each client consents after disclosure.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected;  and

(2) the client consents after disclosure."  134 Ill. 2d R. 1.7.

A party seeking to disqualify counsel bears the burden of proving a conflict of interest.  
Franzoni v. Hart Schaffner & Marx
, 312 Ill. App. 3d 394, 400, 726 N.E.2d 719 (2000).  Disqualification is a drastic measure and, as such, the Seventh Circuit has stated:

" '[The court] considers the right of a party to select counsel of his choice to be a matter of significant importance, which will not be disturbed unless a specifically identifiable impropriety 
has occurred
.  A disqualification order discredits the bar generally and the individual attorneys particularly.  Thus, while there can be no hesitation to disqualify where impropriety 
has occurred
... judges must exercise caution not to paint with a broad brush stroke under the misguided belief that coming down on the side of disqualification raises the standard of legal ethics and the public's respect.  The opposite effects are just as likely--encouragement of vexatious tactics and increased cynicism by the public.'  [Citation.]"  (Emphasis in original.)  
Guillen v. City of Chicago
, 956 F. Supp. 1416, 1421 (N.D. Ill. 1997).

Rule 1.7 is generally implicated when counsel is representing one client in a lawsuit against another individual who is also the counsel's client.  In other words, counsel is, in effect, on both sides of the lawsuit.  The situation presented to this court is different.  Appellants appear to contend that counsel is representing the receiver, who has a fiduciary relationship to the accounts holders, and, at the same time, representing other clients who do business with the account holders.  Appellants cite no case directly on point and independent research has located no cases with the same or even a similar factual situation.
  However, the rationale of 
Guillen
 is instructive on the analysis applicable to the instant case.  Although 
Guillen
 addressed Disciplinary Rule 5-105(B) (Model Code of Professional Responsibility DR 5-105(B) (1981)), we do not believe there is a substantial difference between that rule and Rule 1.7 because both rules are comparable in purpose and design.   According to 
Guillen
, counsel should not be disqualified "unless there is a substantial basis for believing that 
actual
, rather than merely potential, conflicts of interest are afoot."  (Emphasis in original.)  
Guillen
, 956 F. Supp. at 1422.  See also 
Shaffer v. Farm Fresh, Inc.
, 966 F.2d 142, 145 (4th Cir. 1992) (disqualification "may not be rested on mere speculation that a chain of events whose occurrence theoretically could lead counsel to act counter to his client's interests might in fact occur").  Although noting that the potential for conflict is always present in multiple-representation cases, the 
Guillen
 court stated that  " '[w]ithout more, however, that potential is insufficient to compel withdrawal or disqualification.  Vague and general inconsistencies of position giving rise to hypothetical conflicts in the mind of an opposing party will not justify so drastic a measure as disqualification.'  [Citation.]"  
Guillen
, 956 F. Supp. at 1423.  

The 
Guillen
 court also analyzed the situation presented to it under Rule 1.7 of the Rules of Professional Conduct for the Northern District, noting that much of the same analysis applicable to Rule 5-105(B) applied to Rule 1.7.  Additionally, according to the 
Guillen
 court, disqualification under Rule 1.7 should only occur when "positions taken by an attorney's clients are directly antagonistic."  
Guillen
, 956 F. Supp. at 1425.  Again, the mere potential that a conflict of interest might occur is insufficient for disqualification.  
Guillen
, 956 F. Supp. at 1426.  See 
Chapman Engineers, Inc. v. Natural Gas Sales Co.
, 766 F. Supp. 949, 956 (D. Kan. 1991) (refusing to disqualify counsel since "[t]he likelihood of a conflict in positions *** is nothing more than speculation over possibilities"). 

We first point out, as the trial court and receiver have pointed out, appellants never filed a motion to disqualify counsel.  Rather, they filed a motion for a hearing on the potential conflict of counsel.  Appellants have cited no authority in support of such a motion.  

Moreover, appellants have waived the right to challenge any alleged conflict of interest by failing to promptly raise the issue.  "A party waives any objection to an alleged attorney conflict of interest if it fails to assert that conflict promptly."  
International Insurance Co. v. City of Chicago Heights
, 268 Ill. App. 3d 289, 302-03, 643 N.E.2d 1305 (1994).  Appellants did not raise the question of counsel's conflict, if any, until February 25, 2001, some seven months after entering the case.  See 
Tanner v. Board of Trustees of the University of Illinois
, 121 Ill. App. 3d 139, 146-47, 459 N.E.2d 324 (1984) (holding that a nine-month delay in asserting attorney conflict waived objection).  During the period of appellants' participation in the trial court proceedings, an extensive number of hearings on differing issues were held, in particular, a hearing on the receiver's request for fees, including fees for its counsel.  In light of the fact that there were so many hearings and so much occurred in the proceedings prior to the time appellants raised this issue, it is inconceivable to think that appellants were not aware early in the proceedings who the receiver's counsel was and that counsel had ties to the commodity futures industry.  Appellants' request some seven months after first appearing in the proceedings is therefore untimely.

In any event, aside from waiver, appellants have not met the burden required to demonstrate a conflict of interest in any concrete form.  Their allegations are hypothetical and speculative at best.  The alleged basis for asserting a conflict of interest does not even demonstrate a 
potential
 conflict of interest, let alone an 
actual
 conflict of interest.  They merely speculate that a chain, which may be linked ultimately to their clients, could be influencing the receiver's counsel in making recommendations with respect to the allocation process.  There is no evidence that the firm's representation of the defendants in the federal lawsuit or its connection with the commodity futures brokers had any adverse effect on its representation of the receiver or any influence on the receiver's chosen method of allocation.  Moreover, there is no evidence that counsel was not fully and zealously representing the interests of the receiver and those parties to whom the receiver owed a duty of protection.  The possibility of a conflict of interest in the present case is at best remote and uncertain.  Therefore, we find that the trial court did not err in not allowing account holders to engage in the speculation and fishing expedition they sought to undertake at this late stage of the proceedings.  See 
Guillen
, 956 F. Supp. 1416; 
Chapman Engineers
, 766 F. Supp. 949.

IV.  Allocation of Cash Shortage

Substantively, appellants (O'Brien and Bommer)
(footnote: 15) contend that the trial court erred in refusing to exclude their identifiable noncash assets from the allocation process and in refusing to return those assets to the account holders.  We disagree.

The original rule in England when one's money was commingled with the money of a wrongdoer was that the right to follow the money was lost since "money has no earmark."  
Taylor v. Plumer
, 105 Eng. Rep. 721 (K.B. 1815); 
Trusts--Tracing Principles Applicable Where Funds of Two or More Cestuis Are Wrongfully Commingled
, 35 Mich. L. Rev. 1203 (1937).  This rule was changed in 
In re Hallet's Estate
, 13 Law. Rep. 696 (1880), wherein a claimant was granted a right in a commingled fund based upon either the equitable principle of constructive trust or an equitable lien.  The United States adopted the latter rule in 1881 in 
Central National Bank of Baltimore v. Connecticut Mutual Life Insurance Co.
, 104 U.S. 54, 26 L. Ed. 693 (1881).  Thus, as a general rule, the commingling of trust funds with other funds does not destroy the identification of the trust funds.  76 Am. Jur. 2d 
Trusts
 §298, at 313 (1992).  An individual with an interest in a trust fund is accorded priority over the general creditors of the wrongdoer who has commingled the funds so long as the commingled fund remains intact and the individual is able to trace his funds to the commingled fund.  5 A. Scott & W. Fratcher, Scott on Trusts §515, at 609 (4th ed. 1989) (hereinafter, Scott on Trusts).  The rule was later extended to cases in which money from the commingled fund was used to acquire property.  As such, the trust account holder is entitled to follow his money into the property and is granted an equitable lien or constructive trust on it.  5 Scott on Trusts §516, at 610-11.  See also G. Bogert & G. Bogert, Law of Trusts & Trustees §921, at 429 (2d ed. 1995) (fundamental principle of English common law was that a change in the form of property was not a change in ownership).  "[A] trust will follow property through all changes in its state and form, so long as such property, its product, or its proceeds are capable of identification."  76 Am. Jur. 2d 
Trusts
 §292, at 306-07 (1992).  Where a trustee commingles funds and later withdraws money from the commingled fund, the trust account holder is entitled to enforce his equitable lien upon the funds that remain (5 Scott on Trusts §517, at 618), and, if the wrongdoer remains solvent, the claimant is granted a priority over general creditors.  5 Scott on Trusts §517, at 618-19.   To facilitate these equitable principles, the equitable principle of tracing was devised to enable a trust account holder to identify as his, money in a fund wherein a wrongdoer commingled his own money with that of the trust account holder.  This tracing rule was not originally devised for situations where multiple trust fund holders' monies were commingled.  35 Mich. L. Rev. at 1205.  See also 1 G. Palmer, Law of Restitution §2.14, at 177 (1978). 

The general rule where money held in trust on behalf of more than one beneficiary is commingled into a single fund is that the beneficiary's interest in the commingled fund is in proportion to his contribution, or a 
pro rata
 share.  5 Scott on Trusts §519, at 641; 35 Mich. L. Rev. at 1203; A. Scott, 
Following the Res and Sharing the Product
, 66 Harv. L. Rev. 872, 874 (1953); 
County Commissioners of Frederick County v. Page
, 163 Md. 619, 639, 164 A. 182, 191 (App. 1933); 
Leach v. Farmers' Savings Bank of Hamburg
, 204 Iowa 1083, 1089, 216 N.W. 748, 751 (1927).  If the wrongdoer uses the commingled funds to acquire property, a beneficiary can enforce an equitable lien or constructive trust upon the property on a 
pro rata
 basis, 
i.e.
, he could follow his funds into a different form.  5 Scott on Trusts §519, at 641.  See also 
In re Lemons & Associates, Inc.
, 67 B.R. 198, 212 (D. Nev. 1986).  In such situations, the beneficiaries, as a class, are entitled to priority over the wrongdoer and his creditors.  However, as between the several beneficiaries themselves, the general rule is that there is no reason to prefer one claimant over another claimant.  5 Scott on Trusts §519, at 641.  See also 
Reichert v. Fidelity Bank & Trust Co.
, 261 Mich 107, 112, 245 N.W. 808, 810 (1932) ("more equitable distribution of the assets of an insolvent bank or trust company will be accomplished if preferences and priorities are avoided"); 
Commonwealth ex rel. Bell v. Trademen's Trust Co.
, 250 Pa. 378, 382, 95 A. 577, 578 (1915) (the plaintiff's claim, whose funds were commingled along with other customers of the bank, did not rise any higher than the claims of the others similarly situated).  A claimant seeking preference over other creditors is required to show a sufficient ground for doing so and the principle of "equality is equity" generally controls.  5 Scott on Trusts §521.3, at 667.  

The general rules outlined above with respect to the commingling of multiple trusts are applicable in the instant case.  No preference should be given to non-cash account holders over cash account holders-–each type of account being a trust account and being of equal dignity with the other.  We disagree with appellants that a sufficient ground for preference exists because their accounts are special deposits whereas cash account holders, or at least some of the cash account holders' accounts, are general deposits.  As discussed above, all monies deposited with Intrust were special deposits.  This includes those funds that were deposited with Intrust in the cash management program for no other purpose than to remain as cash to cover margin calls.  Notwithstanding that these funds were not to be converted into noncash investments but were to remain as cash, the depositors did not leave this 30% with Intrust for Intrust's use as it saw fit.  The monies did not become Intrust's nor was Intrust entitled to treat the funds as its own as would be the case with general deposits.  

Similarly, Intrust did not become a debtor of the account holders because of the deposits.  It remained a custodian for the monies to be held separately and apart from its own assets.  As such, there is no distinction to be drawn on the basis of general deposits versus special deposits warranting a preference of noncash account holders over cash account holders, each being a special deposit.  See
 In re Michigan Boiler & Engineering Co.
, 171 B.R. 565 (E.D. Mich. 1993); 
United States v. Doyle
, 486 F. Supp. 1214 (D. Minn. 1980); 
First State Trust & Savings Bank of Springfield v. Therrell
, 103 Fla. 1136, 138 So. 733 (1932); 
Reichert
, 261 Mich. at 112, 245 N.W. at 810; 
Bell
, 250 Pa. at 382, 95 A. at 578.

Virtually all account holders, be they cash accounts or noncash accounts, are similarly situated from an equitable perspective.  Intrust perpetrated a fraud against all of them.  All account holders have equally been defrauded, are equally innocent, and possess competing and overlapping claims.  See 
In re Lemons & Associates
, 67 B.R. at 212 ("placed" investors (those who had been assigned a particular promissory note upon deposit of their money with the investment company) and "unplaced" investors (those who were never assigned a particular promissory note because of an insufficient number of notes available for assignment) had competing and overlapping claims to the notes and "placed" investors were not entitled to a preference).  Were we to allow noncash account holders the return of "their" property because their funds were allegedly special deposits, we would be allowing them to benefit from the fraud inflicted upon cash account holders.  Equity will not sustain such a result in this case.  See 
In re Lemons & Associates
, 67 B.R. at 213.  Accordingly, noncash account holders must share on a 
pro rata
 basis in the shortage with cash account holders.

Several out-of-state decisions support our conclusion.  In 
In re Michigan Boiler & Engineering
, a subcontractor began an adversary proceeding against a chapter 11 (11 U.S.C. §1101 
et seq.
 (1988)) contractor seeking to recover money paid to the contractor by owners as payment for work performed.  The funds received from owners were considered trust funds under Michigan law for the benefit of laborers, subcontractors, 
etc.
  
In re Michigan Boiler & Engineering
, 171 B.R. at 566.  When the contractor received money from its customers, it deposited the money in its general bank account, a commingled fund.  
In re Michigan Boiler & Engineering
, 171 B.R. at 566.  Subcontractors and laborers were paid out of this account.  
In re Michigan Boiler & Engineering
, 171 B.R. at 567.  Hundreds of payments from customers were deposited into this account as well as other funds received by the contractor.  
In re Michigan Boiler & Engineering
, 171 B.R. at 568.  At the time the subcontractor sought to impose a constructive trust, there were 213 other similarly situated subcontractors or beneficiaries of the trust fund.  
Although outlining the general rule that when a trustee commingles trust funds with his own funds, the entire account is impressed with a constructive trust, the court stated that "when the fund with which the wrongdoer is dealing is wholly made up of the fruits of the frauds penetrated against a myriad of victims, the case is different."  
In re Michigan Boiler & Engineering
, 171 B.R. at 576.  Because other similarly situated parties, to the subcontractor, could with equal force advance the same arguments made by the subcontractor, the court denied the subcontractor's claim, stating that the subcontractor "and such others are sufficiently equally innocent in the situation to require the application of the equality is equity rule."  
In re Michigan Boiler & Engineering
, 171 B.R. at 576.
(footnote: 16)
 Similarly, in 
Doyle
, a case involving theft of securities by the defendant/thief, the court held that closet bond claimants (those investors where bonds were "assigned" to them and were found in envelopes with the investors' names on them in the defendant's closet) were not entitled to priority over suitcase bond claimants (those investors where bonds had been "assigned" to them by the defendant, but which the defendant "unassigned" by removing them from their envelopes, placing them in a suitcase, and absconding with them), but all would share 
pro rata
.  
Doyle
, 486 F. Supp. at 1221.  In 
Doyle
, the defendant was a security broker whose customers purchased bearer bonds and who were claimants in the proceedings before the court.  
Doyle
, 486 F. Supp. at 1216.  The defendant purchased bonds in large lots before receiving orders from customers and would then "sell" the appropriate amount of bonds to the customer when he received their money.  When the defendant received money, he commingled it with monies of other customers and his own money.  In addition, defendant often used one customer's money to purchase bonds that were then "sold" to a different customer.  
Doyle
, 486 F. Supp. at 1216.  The defendant did not deliver the bonds to his customers but instead placed the "assigned" bonds in an envelope with the customer's name and address.  He did not, however, include the bond number allocated to that customer.  
Doyle
, 486 F. Supp. at 1217.  The defendant also kept a looseleaf binder in which he recorded purchases.  Because of the defendant's method of bookkeeping, no records were available to allow the customers to trace their money to ownership of any specific or particular bond. 
 Doyle
, 486 F. Supp. at 1217.

The defendant fled the country, taking with him approximately $2 million of the bonds that he placed in his suitcase (suitcase bonds).  Prior to his departure, he destroyed the envelopes from which he removed the bonds as well as the binder.  
Doyle
, 486 F. Supp. at 1217.  These bonds were later recovered and returned to the court.  
Doyle
, 486 F. Supp. at 1217.  The defendant's family, while he was a fugitive, discovered additional bonds, approximating $300,000, in envelopes with customers' names on them in a closet (closet bonds).  
Doyle
, 486 F. Supp. at 1218.  The individuals named on the closet bonds sought preferential treatment over the remainder of the claimants on the basis that the bonds in the closet were in envelopes with their names on them and were, thus, segregated and, therefore, sufficiently identified.  
Doyle
, 486 F. Supp. at 1220.

The court concluded that all bonds, both closet and suitcase, were subject to constructive trusts and all claimants would share 
pro rata
.  
Doyle
, 486 F. Supp. at 1219.  The court reasoned that the closet bond claimants were not entitled to priority over the suitcase bond claimants since the defendant destroyed the binders and envelopes and, therefore, there was no reliable evidence of specific bond ownership.  
Doyle
, 486 F. Supp. at 1221.  In addition, because the bond numbers were not on the envelopes remaining intact, any identification qualities given to them by placing them in the envelopes were destroyed.  
Doyle
, 486 F. Supp. at 1221.

The case most directly on point is that relied upon by the receiver,
 First State Trust & Savings Bank
.  In 
First State Trust & Savings Bank
, a case involving the liquidation of Biscayne, a bank and trust company, the court held that four different classes of claimants, each holding a different type of trust asset, must share  
pro rata
 in the distribution of the total assets of the insolvent company.  
First State Trust & Savings Bank
, 
103 Fla. at 1151, 138 So. at 739.  The following four account holders sought  to establish preferred claims: Ottis, who was executor and trustee of an estate and who had deposited $2,000 with Biscayne to be held in escrow until title to a certain piece of property was declared marketable; Moss, who was an owner of a gold note on whose behalf a deed of trust or mortgage was delivered to Biscayne; Larasen, whose estate was being administered by Biscayne, which had collected and was holding cash and property belonging to the estate in the amount of $23,686; and Ullendorff, who had conveyed certain personal property valuing $50,100 to Biscayne as trustee.  A fifth group of claimants was also involved, individuals who held savings accounts at Biscayne, who sought to avoid any preferential claims.  
First State Trust & Savings Bank
, 103 Fla. at 1142-43, 138 So. at 735-36.  When Biscayne closed it doors, it had over 1,200 trust and savings accounts and insufficient money to pay all claimants.  
First State Trust & Savings Bank
, 103 Fla. at 1143, 138 So. at 736.  

The chancellor concluded that Ottis, Moss, Larasen, and Ullendorff were trust claimants and that the other common creditors or savings account holders were general creditors of Biscayne.  He further concluded that Ottis, Moss, and Larasen fell into a class it designated as class A claimants and Ullendorff fell into class B.  With respect to distribution of Biscayne's assets, the chancellor held that class A claimants were to be paid 
pro rata
 with all other class A claimants only from the 
cash assets
 of Biscayne.  
First State Trust & Savings Bank
, 103 Fla. at 1145, 138 So. at 737.  The surplus, if any, was to be distributed to class B claimants.  Class B claimants were to be paid on a 
pro rata
 basis with all other class B claimants from the 
proceeds of the sale
 of stocks, bonds, mortgages, notes, securities, and other collateral in which any funds of Biscayne's had been invested.  The surplus from those proceeds, if any, would then be distributed to class A claimants.  
First State Trust & Savings Bank
, 103 Fla. at 1145, 138 So. at 737.  Lastly, the general creditors would share in a 
pro rata
 basis with all other common creditors but only after all class A and class B claimants had been paid in full.  
First State Trust & Savings Bank
, 103 Fla. at 1145, 138 So. at 737.  Based upon this distribution method, class A claimants would only receive approximately 10% of their claims, whereas class B claimants would receive 100% of their claims.  
First State Trust & Savings Bank
, 103 Fla. at 1146, 138 So. at 737
.  

The question before the reviewing court was 
"[w]hen the total assets of an insolvent trust company in the hands of the state banking department are admittedly shown to be inadequate to pay the preferred claims against it, may the preferred claimants be classified on some reasonable basis and each claimant of a class be required to share 
pro rata
 in designated assets of the trust company, or may there be preferences as to payment among them?"  
First State Trust & Savings Bank
, 103 Fla. at 1145-46, 138 So. at 737.  The court answered in the negative.  Because the issue before the court involved a battle between claimants and not a question of preference over general creditors, the court reasoned:

"[t]hat part of the decree of the chancellor classifying the preferred claimants into classes A and B, if sound and reasonable, must rest on the presumption that the trustee, Biscayne Trust Company, kept segregated and held in specie or liquid assets all trust funds turned over to it which it had no power to invest and reinvest, and that it invested those trust funds placed in its hands which it was authorized to invest as the law directs.  If this presumption was supported by the facts, the classification might be upheld, but, being completely rebutted by the facts as disclosed by the record, and resulting in such an inequitable distribution among the preferred claimants, we do not think it should be allowed to stand.
"  
First State Trust & Savings Bank
, 103 Fla. at 1146, 138 So. at 737.

Despite the classification made by the chancellor, the reviewing court found: 

"
The trusts for which Biscayne Trust Company was acting as trustee but was not authorized to invest their funds include court trusts, such as guardianships, administratorships, executorships, corporate trusts, escrows, and other miscellaneous trusts.  Those trusts for which it was acting as trustee, but was authorized to invest and reinvest their funds, include executorships and other miscellaneous trusts.  In other words, trusts of equal and like dignity are found in both classes."  
First State Trust & Savings Bank
, 103 Fla. at 1147, 138 So. at 738. 

As such, there was no basis to separately classify different trust claimants 
unless a particular claimant could trace his or her money into the cash assets or specific investments or securities.  After discussing tracing principles, the court concluded that claimants were not able to identify or trace their specific funds.
(footnote: 17)  Accordingly, because claimants were equally situated and they were unable to trace their specific funds, the court held all preferred claimants would bear the loss and participate in the distribution of the total assets of Biscayne on a 
pro rata
 basis.

As in these three cases, the funds of Intrust's noncash account holders and cash account holders were commingled.  All accounts at some point in time were converted to cash and placed in a single commingled fund before ultimately finding their way into noncash assets.  Too, Intrust had insufficient funds to satisfy all trust claims.  Moreover, noncash and cash account holders were similarly and equally situated.  All deposited money with Intrust as special deposits for a particular purpose.  To be sure, because of the fraud perpetrated upon all, there is no basis to give preference over one class of account holders as opposed to another.  All must share equally.

More overridingly, we disagree with appellants' argument that Illinois case law requires the return of their noncash assets because the assets must be deemed found as is, and because they were found as specific, identifiable assets, they had to be returned to noncash account holders.  These accounts are analogous to the closet bonds in 
Doyle
 in that there is no indication that they retained their original identity as opposed to being identified only after their acquisition from a common fund.

Appellants maintain that the Illinois Supreme Court, since 1902, has required the return of identifiable trust assets even though the money used to purchase the assets passed through a commingled account.  According to appellants, the noncash account holders have the clear ability to identify their assets because they are held by third parties.  Appellants rely on 
Woodhouse v. Crandall
, 197 Ill. 104, 64 N.E. 292 (1902) to support this position.  

The 
Woodhouse
 court held that because the plaintiff was able to show that money placed in trust for his benefit with the defunct bank was in a specified place (a certificate of deposit), he was entitled to follow it and reclaim it over the interests of general creditors of the bank.  
Woodhouse
, 197 Ill. at 116.  In 
Woodhouse
, a lessee deposited $1,500 with a bank as security for performances of his lease with lessor.  
Woodhouse
, 197 Ill. at 107.  A receipt was given to the lessee, which stipulated the purpose and specific use of the money in event of the lessee's default.  
Woodhouse
, 197 Ill. at 107.  The banker turned the money over to a teller who deposited it in the bank's general funds.  
Woodhouse
, 197 Ill. at 107-08.  However, the banker thereafter, to conform to the bank's system of bookkeeping, made out a certificate of deposit, which he attached to the receipt he had retained.  
Woodhouse
, 197 Ill. at 108.  This certificate of deposit was meant to distinguish and identify the money.  The bank subsequently became insolvent and the lessor sought payment of the deposit to him based on the lessee's default.  
Woodhouse
, 197 Ill. at 108.  The trial court refused the lessor's request, finding that because the money was commingled with the bank's money, the lessor was entitled only to a 
pro rata
 share of the bank's remaining assets along with the general creditors of the bank.  
Woodhouse
, 197 Ill. at 109.

In reversing, the Illinois Supreme Court noted that the lessee's deposit was for a specific purpose and was not a general deposit into the bank and, therefore, a trust relationship was created for the benefit of the lessor.  
Woodhouse
, 197 Ill. at 109.  The bank's receiver argued that the money was commingled with other monies of the bank and therefore it could not be identified or recovered.  
Woodhouse
, 197 Ill. at 110.  In answer to this, the 
Woodhouse
 court set forth the well-established law on commingling:

"[I]f the trust fund can be traced and identified, the 
cestui que
 
trust
 has a right to it and to the aid of a court of equity to reach it and compel its transfer to him.  His right will not be affected by any change in the form of the trust property by the trustee, provided that the fund can be identified and 
is not so mixed up with other moneys or property that it can no longer be specifically separated.
  (2 Pomeroy's Eq. Jur. sec. 1058.)  Concerning this rule the same author says (sec. 1048): 'This universal rule forms the protection and safeguard of the rights of the beneficiaries in all kinds of trust. It enables them to follow trust property,--lands, chattels, funds, or securities, and even of money,--as long as it can be identified, into the hands of all subsequent holders who are not in the position of 
bona fide
 purchasers for value and without notice. ***' ***  So long as it can be identified, either as the original property of the 
cestui que
 
trust
 or as a product of it, equity will follow it, and the 
right to reclaim it fails only when the means of ascertaining its identity fails. 
 [Citation.]  In the case of 
Wetherell v. O'Brien
, 140 Ill. 146, although the deposit was a general one and there was no trust or trust fund, the court stated the general rule, as follows (p. 151): 'Where a trustee changes the form of the trust property, the right of the beneficial owner to reach it and compel its transfer may still exist if the property can be identified as a distinct fund, and is 
not so mixed up with other moneys or property that it can no longer be specifically separated.
'  In 
Pennell v. Deffell
, 4 DeG., M. & G. 372, it was said: '[Additionally], all property belonging to a trust, however much it may be changed or altered in its nature or character, and all the fruit of such property, whether in its original or in its altered state, continues to be subject to, or affected by the trust.' "  (Emphasis added.)  
Woodhouse
, 197 Ill. at 110-11. 

However, the court also pointed out:

"It has repeatedly been held that if the identity of a trust fund is lost so that it cannot be traced, the beneficiary cannot establish a preferential claim or lien against the general assets of an insolvent estate ***.  The mere fact that an insolvent received a trust fund which he has disposed of or dissipated, or mingled with his other funds and property, so that it is impossible to trace the fund and show where it is, will not enable the 
cestui que
 
trust
 to establish a lien against the assets of the estate.  [Citations.]"  
Woodhouse
, 197 Ill. at 110.

The material issue before the 
Woodhouse
 court was whether the money deposited by lessee could be traced and identified, with the court noting that it was not necessary for the lessor to identify specific bills, coins, or individual pieces of money.  
Woodhouse
, 197 Ill. at 111-12.  In 
Woodhouse
, the court concluded that the evidence was sufficient to establish the identity of the lessee's fund and to show what had become of it.  
Woodhouse
, 197 Ill. at 116.  Specifically, the 
Woodhouse
 court stated:

"
The only question here is what is a sufficient identification, and the rule is, that if it can be shown the money is in a specified place, equity will take out of that place enough money to satisfy the trust. In this case, we think that the trust fund was traced and identified by legitimate evidence and rules of law for ascertaining its identify.
"  
Woodhouse
, 197 Ill. at 116.

Woodhouse
 however is inapposite.  The tracing formula in 
Woodhouse
 is geared to establish a basis upon which to assert the priority of special deposits over the general creditors.  
Woodhouse
 does not mandate the return of the noncash accounts to their holders in derogation of the rights of other trust account holders whose accounts are of equal dignity.  
Woodhouse
 deals only with one trust beneficiary's claim against the general creditors of the insolvent bank.  It does not address the circumstances where multiple trust funds were commingled and one trust beneficiary is making a claim against another trust beneficiary.  In other words, 
Woodhouse
 does not deal with a battle between various trust claimants as in the case 
sub judice
.  As such, the rules set forth by the 
Woodhouse
 court relate to and mirror those fundamental common law principles outlined above with respect to commingling by the trustee of his own funds with a beneficiary's fund and its decision is dependent on that special circumstance.  The rules with respect to competing trust claimants are distinct.  In sum, the 
Woodhouse
 decision applies only to a trust claimant's claim for preference over general creditors.  There is therefore no reason to conclude that 
Woodhouse
's holding on this point 
is inconsistent with the holdings in 
In re Michigan Boiler
, 
Doyle
, and 
First State Trust & Savings Bank
.

Based on the above principles and the rationale universally espoused under existing case law, noncash account holders are not entitled to a preference over cash trust account holders.  Accordingly, noncash account holders are subject to the allocation process on a 
pro rata
 share with all similarly situated claimants (cash account holders) unless they can directly trace their funds to specific assets.  See 
First State Trust & Savings Bank
, 103 Fla. at 1148, 138 So. at 738.

In order to be excluded from the allocation process absent establishment of a preference, appellants must identify and directly trace their deposits in the commingled account to the noncash assets they identify as theirs.  To do so, they must satisfy the dictates of well-established rules. 

" 'The general proposition which is maintained, both at law and in equity, *** is, that if any property, in its original state and form, is covered by a trust in favor of the principal, no change of that state and form can divest it of such trust ***.  It matters not in the slightest degree into what other form different from the original the change may have been made, *** for the product of a substitute for the original thing still follows the nature of the thing itself, 
so long as it can be ascertained to be such
.'  [Citation.] "  (Emphasis added.)  
Union National Bank of Chicago v. Goetz
, 138 Ill. 127, 134-35, 27 N.E. 907 (1891).

One can follow his money so long as it is not so mingled with other money or property that it can no longer be specifically separated.  4 S. Symons, Pomeroy's Equity Jurisprudence §1058c, at 148 (5th ed. 1941).  See 
Woodhouse
, 197 Ill. at 110 (property cannot be "so mixed up with other moneys or property that it can no longer be specifically separated").  The question is whether noncash assets were acquired from and are the product of the original funds, 
e.g.
, whether the specific noncash assets can be traced to their original form.  See 
People ex rel. Nelson v. First State Bank of Barrington
, 274 Ill. App. 46, 58 (1934).  

Strict identification is required.  G. Bogert & G. Bogert, Law of Trusts & Trustees §921, at 435 (2d ed. 1995).  The claimant must prove that his specific funds were used to purchase a specific subsequent asset.  It is not enough to show only that the property 
may have been
 a product of the trust fund.  G. Bogert & G. Bogert, Law of Trusts & Trustees §921, at 435 (2d ed. 1995).  In other words, "it is not enough to simply show that trust funds went into the commingled account."  
In re Michigan Boilers & Engineering
, 171 B.R. at 569.  

Courts describe strict identification in varying terms.  Direct tracing or a direct chain from the money deposited into the commingled fund to another asset or other fund has been required.  
Sadacca v.  Monhart
, 128 Ill. App. 3d 250, 257, 470 N.E.2d 589 (1984) (the plaintiff must establish that the subsequent property is in "a direct chain from the first deposit").  Another court has stated that a claimant " 'must trace the equitable right asserted in an unbroken line to the property he seeks to impress with the trust.'  [Citation.]"  
In re Country Junction Inc
, 41 B.R. 425, 423 (W.D. Tex. 1984).  See also 
Prodata Computer Services, Inc. v. Ponec
, 256 Neb. 228, 236, 590 N.W.2d 176, 182 (1999); 
Bennett v. Glacier General Assurance Co.
, 259 Mont. 430, 436, 857 P.2d 683, 687 (1993).  Still another court has held that tracing requires the claimant to trace the flow of funds from one repository to the next.  
County of Oakland v. Vista Disposal, Inc.
, 900 F. Supp. 879, 891 (E.D. Mich. 1995).  One court has dictated that tracing requires the claimant to trace with particularity.  
Haley, Chisholm & Morris, Inc.  v.  Parrish
, 127 B.R. 366, 372 (W.D. Va.  1991).  Similarly, tracing has required a showing of "step by step" dealings between the trustee and others.  G. Bogert & G. Bogert, Law of Trusts & Trustees §921, at 435 (2d ed. 1995).  Lastly, one court has held that the claimant must trace his funds 
through
 the commingled account.  
In re Michigan Boiler & Engineering
, 171 B.R. at 569.

However: 

" '
The right [to trace property through a commingled fund] ceases when the means of ascertainment fail, which, of course, is the case when the subject matter is turned into money, and mixed and confounded in a general mass of property of the same description.'
  [Citation.]  ***  [Citation].  ***

***

*** 'So long as it can be identified, either as the original property of the 
cestui que trust
 or as the product of it, equity will follow it ***.  *** but the right of pursing it fails when the means of ascertainment fail.'  [Citation.] "  (Emphasis added.)  
Union National Bank
, 
138 Ill. at 134-35.

See also 
Woodhouse
, 197 Ill. at 111 (right to reclaim property through change in form fails if means of ascertaining identification fails). 

Thus, the initial contention of appellants that commingling of funds cannot serve as a basis to include their accounts in the allocation process once those funds were converted into noncash assets and then identified by third parties or the thief to their accounts must fail.  See 
Doyle
, 486 F. Supp. at 1221.  It is the source of the money used to acquire those assets which must control and, in this instance, those monies came from a commingled fund.  
Based on the above-enunciated principles, the issue of commingling certainly is relevant and, in fact, is essential to the issue of one's ability to trace.  Where, as here, the ability to trace funds and the formula devised for that purpose is no better for one claimant than another and both claims are otherwise of equal dignity, they must both share on a 
pro rata
 basis.  
First State Trust & Savings Bank
, 103 Fla. at 1148-49, 138 So. at 738.

We disagree with appellants' argument that there was no evidence their funds were commingled or were in the commingled account at the time of misappropriation.  This argument fails because the trial court made a specific finding of fact on this question, which finding was supported by ample evidence.  Particularly, the receiver's recommendations, reports, and testimony show that virtually all account assets passed through the commingled account at some point in time and that the amounts derived from liquidation of noncash assets were placed into the commingled account and then withdrawn again in connection with investment transactions.  Appellants have provided no evidence to the contrary.  It is not this court's privilege to disturb the trial court's finding of fact.

We also disagree with appellants' arguments that the trial court erroneously placed the burden on them to show that their funds were traceable and not misappropriated.  A claimant generally has the burden of tracing his money or property.  5 Scott on Trusts §521.3, at 664; G. Bogert & G. Bogert, Law of Trusts & Trustees §923, at 449 (2d ed. 1995).  Specifically, where commingling is proper, as in the instant case, the claimant has the burden to trace and distinguish his money from that of other people's money.  
Sadacca
, 128 Ill. App. 3d at 258 (burden on the defendant seeking to impose a constructive trust to show that the money she sought to impose with a trust was paid out of trust 
res
 as opposed to being paid out of other funds deposited in commingled account).  See also 
In re Country Junction
, 41 B.R. at 432; 
Peirce v. Sheldon Petroleum Co.
, 589 S.W.2d 849, 853 (Tex. Civ. App. 1979).  

As in 
Woodhouse
, the material question before us is whether noncash account holders have satisfied their burden of showing that their money deposited into the commingled fund can be identified and directly traced to those specific assets they now hold.  In other words, are the tangible items (noncash assets) more identifiable than fungible items (cash assets).  Appellants cannot meet this burden and the evidence in the record shows that noncash assets are no more identifiable than cash assets.

Some examples are instructive and advantageous to our analysis.  In 
Sadacca
, the defendant purchased a condominium from the husband, which was jointly owned by the plaintiff.  The plaintiff's husband, who subsequently died, received the proceeds of the sale and put $16,000 of the proceeds into his checking account and purchased certificates of deposits with the remaining $200,000.  Each month the husband sent $3,500 in allowance to the plaintiff, who lived in Florida.  Over the course of the five months following the sale, the husband cashed in the certificate of deposits and purchased smaller certificates of deposit, depositing any balance from the rollovers into his checking account.  At the time the husband died, there was one $100,000 certificate of deposit remaining.  The executor of the husband's estate cashed in the certificate of deposit and gave the plaintiff $75,000 as her widow's share.  
Sadacca
, 128 Ill. App. 3d at 252-53.  During the course of administering her husband's estate, the plaintiff discovered that he had sold the condominium.  She then filed suit to quiet title, alleging that her name had been forged on the deed given to the defendant.  The defendant counterclaimed, based on the husband's breach of contract for failure to convey full title, seeking to impose a constructive trust on the $75,000 widow's share as well as on the $21,000 paid to the plaintiff as allowance over the course of the five months following the sale and the husband's death.  
Sadacca
, 128 Ill. App. 3d at 253.  The trial court entered judgment against the defendant and in favor of the plaintiff.  

On appeal, the defendant contended that the trial court erred in refusing to impose a constructive trust for her benefit.  
Sadacca
, 128 Ill. App. 3d at 255.  The appellate court agreed in part and disagreed in part.  According to the court, the estate was the constructive trustee, not the plaintiff, holding property belonging to the defendant condominium purchaser and, as such, the funds forwarded to the plaintiff could be followed and imposed with a constructive trust as long as they were identifiable.  
Sadacca
, 128 Ill. App. 3d at 257.  The court concluded that identification and tracing of the $100,000 certificate of deposit was established through testimony at trial, which demonstrated that the certificate of deposit was "in a direct chain" from the original deposit of the sale proceeds and thus, was an "identifiable 
res
."  
Sadacca
, 128 Ill. App. 3d at 257.  Accordingly, the trial court erred in refusing to impose a constructive trust on the $75,000.  

However, the court concluded that the trial court did not err in refusing to impose a constructive trust on the $21,000 because these amounts were paid out of the husband's checking account and, although the balances of the cashed-in certificates of deposits (proceeds of the sale) were deposited into the checking account after being rolled over, money from other sources had also been deposited into the checking account and, as such, the defendant could not sufficiently demonstrate that the $21,000 came from the trust proceeds itself.  
Sadacca
, 128 Ill. App. 3d at 257.  Accordingly, the defendant could not sufficiently trace the funds and therefore could not follow them into their changed form.

Also enlightening is a revisit to 
Michigan Boiler & Engineering
.  As detailed above, the contractor in 
Michigan Boiler & Engineering
 deposited hundreds of payments it received from its customers for the benefit of subcontractors and laborers into a commingled account into which the contractor also deposited other money it received.  One subcontractor, in the contractor's bankruptcy proceeding, sought a constructive trust on money paid on its behalf.  At this time, there were 213 other subcontractors or beneficiaries of the commingled account.  The bankruptcy court denied the subcontractor's request, finding "[t]
he trust beneficiary must trace the trust funds through the commingled account(s) and it is 
not enough to simply show that trust funds went into the commingled account
.
"   
(Emphasis added.)
 In re Michigan Boiler & Engineering
, 171 B.R. at 569.  
The district court on review agreed with this proposition.  The district court further 
noted that the case before it was not simple because a substantial portion of the balance of the trust account, before the at-issue owner's deposit, consisted of trust funds to which additional funds were added, both trust and nontrust, and from which millions of dollars were disbursed at different intervals to persons or entities who were deemed to be additional trust beneficiaries as well as to other individuals.  
In re Michigan Boiler & Engineering
, 171 B.R. at 571.  
According to the Michigan court, the case before it was "a worse case scenario encompassing most, if not all, of the elements" of commingling identified in other cases.  As such, the court found: 

"
There were multiple trust funds created with respect to virtually every one of debtor's jobs in this case and, no doubt, multiple cestuis of each one.   All were equally innocent in the aftermath of the debtor's failure to deal appropriately with each of their trust funds, and all are (or were) in a position to make similar arguments to those of [the claimant]."  
In re Michigan Boiler & Engineering
, 171 B.R. at 573.

Accordingly, the court denied imposition of a constructive trust.  
 Lastly, and perhaps most edifying, are the factual circumstances exposed in 
First State Trust & Savings Bank
, which we also briefly revisit.  There, four trust claimants sought preferential treatment upon insolvency of Biscayne, a bank and trust company.  Each claimant deposited a different type of asset, including some having deposited cash.  Biscayne 
commingled the funds of its trust beneficiaries.  Specifically, Biscayne commingled trust funds received, other funds received, other investments, and securities.  
First State Trust & Savings Bank
, 103 Fla. at 1148, 138 So. at 738.  When Biscayne purchased securities, either for a particular estate or in general, it used funds from the commingled account.  Moreover, Biscayne held a large number of investments that did not belong to any particular claimant and certain trust deposits were secured by investments purchased from a commingled fund that had been enlarged by funds from both trust classes.  According to the court, 
"the funds of each class [of trust claimants] were mixed and commingled with the funds and assets of the other class, the commingled fund was cross-commingled and invested in securities, the values of which in many instances have partially or totally vanished, and it is now utterly impossible to ascertain how or to what extent the various funds in either or both classes have been invested and have depreciated."  
First State Trust & Savings Bank
, 103 Fla. at 1147, 138 So. at 738.

The court held that all preferred claimants should bear the loss and participate in the distribution of the total assets on a 
pro rata
 basis rather than being individually classified and given preference.  The court's rationale for this conclusion was:

"
In [the] state of affairs [presented to it by the commingling] there is no equitable basis to support the classification of trust claimants and distribution of assets among them as made by the chancellor.  The cash assets or their equivalent that should be 
in esse
 to pay class A have been almost entirely dissipated, some of it having been used to purchase the very securities with which it is decreed that class B claimants shall be paid.  It is settled that all contributions to the commingled fund may be used to pay preferred claimants, but there is no way to ascertain what part of the commingled fund is represented by additions from the cash assets, or what part of the securities were paid for with class A or class B funds.  It is certain that the commingled fund represents an inextricable compound that no alchemist would dare the attempt to unscramble."  
First State Trust & Savings Bank
, 103 Fla. at 1148-49, 138 So. at 738.

See also 
In re Gertzman
, 115 N.C. App. 634, 641, 446 S.E.2d 130, 135 (1994) (tracing insufficient where the claimant failed to offer proof to establish the funds he had deposited were used to pay for life insurance proceeds); 
Bennett v. Glacier General Assurance Co.
, 259 Mont. 430, 437, 857 P.2d 683, 687 (1993) (concluding that when money from the general fund was used to purchase stocks and bonds as well as other business transactions, the claimant was unable to identify any transaction in which the amount he deposited was used to purchase stocks or bonds upon which he sought to impose a trust); 
State of Colorado, Department of Natural Resources, Division of Wildlife v. Benjamin
, 41 Colo. App. 520, 523, 587 P.2d 1207, 1209 (1978) (no constrictive trust imposed where, after commingling of funds, it was impossible to determine how much of the claimant's money was used to purchase merchandise upon which the claimant sought to impose trust).

As detailed above, the funds of Intrust's commingled account were added to from myriad sources, including initial deposits by account holders, liquidation of noncash assets in connection with a change in investment, cancellation of an account, or funding for administrative fees, and return of funds placed with other depositories, including Intercounty.  Likewise, money was withdrawn from the commingled account for a horde of reasons, including transfers to another depository, purchase of noncash assets, liquidation of an account, and payment of fees.  The circumstances present in this case mirror those present in 
Michigan Boiler & Engineering
 and in 
First State Trust & Savings Bank
.  As in 
First State Trust & Savings Bank
, "[i]t is certain that the commingled fund represents an inextricable compound that no alchemist would dare to attempt to unscramble."  
First State Trust & Savings Bank
, 103 Fla. at 1149, 138 So. at 738.  If an alchemist cannot untangle the commingled account, there is no logical reason to conclude that account holders, or even the receiver, could do so.  

Moreover, according to the receiver, over 200,000 transactions occurred per week, or over 10 million separate transactions over the 10-year misappropriation period.  All, or virtually all, of the transactions effectuated required a deposit into or withdrawal from, or both, the commingled account.  Intrust's accounting software and recordation systems did not record each transaction as it occurred or even individually.  As such, the balance or type of asset in any given account on any given day cannot be established. 

Here, account holders cannot show that their money was not used to purchase other account holders' assets or that other account holders' deposits were not used to purchase the assets they now hold and maintain as purportedly their specifically identified assets.  In sum, there is no way to ascertain whose money was used for what purpose.  It is utterly impossible to ascertain the extent to which any individual deposit was invested or misappropriated.  It is not logical to conclude and it would constitute a mere legal fiction to find that one account holder's deposit into the commingled fund was actually used to acquire a particular noncash asset rather than from funds which were misappropriated from other trust accounts.  Similarly, it is no more logical to conclude that the funds in the commingled account on any particular misappropriation date belonged to one specific account holder than to conclude that the funds were those of another account holder.  Accordingly, because of the commingling and extensive number of transactions, the chance that an asset, now claimed by one account holder, was procured with the deposits of another account holder is just as great, if not more so, as the chance that the asset was purchased with that account holder's pretheft deposit.  Because appellants cannot directly trace their deposits in the commingled account to the specific assets they now hold, equity commands that they must share 
pro rata
 in the allocation process with all other account holders. 

Appellants advance several additional arguments to support their contention that their noncash assets must be returned to them.  We do not find any of these arguments compelling.  First, appellants argue that section 6-10(5) of the Act requires the receiver to surrender upon demand noncash assets, thus bypassing any further tracing requirements.  According to them, noncash assets must be treated separately from Intrust’s corporate assets and separate from account holders’ interests in the commingled fund.  

Section 6-10(5) provides:

"(5) The receiver shall have authority, and it shall be the receiver's duty, to surrender to the customers of such corporate fiduciary, when requested in writing directed to the receiver by such customers, the assets, private papers and valuables left with the corporate fiduciary for safekeeping, under a custodial or agency agreement, upon satisfactory proof of ownership."  205 ILCS 620/6-10(5) (West 1998).

This section does not, as the appellants contend, distinguish or identify specific types of assets
, e.g.,
 cash assets versus noncash assets.  It refers to "assets, private papers and valuables."  205 ILCS 620/6-10(5) (West 1998).  Had the legislature desired to include the return of only noncash assets upon demand and proof of ownership, there was a simple way to say so.  Moreover, because this act pertains to investment companies, the legislature is presumed to have been aware that certain investments are in cash, whereas other investments take the form of noncash assets.  The legislature did not so specify and we must presume that it was referencing any type of trust asset held by the corporate fiduciary without regard to the exact nature of the asset.  Section 6-10(5) does not provide a basis for exclusion of noncash accounts from the allocation process.  Thus, the receiver under the Act bears the same obligation to every trust account, whether cash or noncash, where there is a shortfall.  That obligation can only be satisfied through reasonable allocation as was achieved in the instant case.

Along the same lines, appellants also argue that the intent of the Act is to effectuate the prompt return of customers’ property held under custodial agreements.  According to them, section 2-8
(footnote: 18) expressly allowed Intrust to commingle funds awaiting investment, and when section 2-8 is analyzed in connection with section 6-10(5), the return of identifiable noncash assets is nevertheless required.  Additionally, appellants argue that under section 2-8(f), account holders have a first lien in the commingled account.

Section 2-8(f) provides: "In the event of the failure of the corporate fiduciary ***, the owners of the fiduciary funds shall have a first lien, to the extent of their interest in such funds, on the cash securities used as collateral hereunder or the surety bond in addition to their claim against the estate of the corporate fiduciary."  205 ILCS 620/2-8(f) (West 1998).  This section merely incorporates the well-established principle of law that special deposits are given a preference over the general creditors of the corporate fiduciary.  See 
Woodhouse
, 197 Ill. 104, 64 N.E. 292.  It does nothing more.  In addition, like section 6-10(5), this section speaks to owners of "fiduciary funds" without distinguishing between funds that are held in cash from those held in noncash investments.  Similarly, it does not state that one class of account holders is entitled to a preference over another.  As with section 6-10(5), section 2-8(f) does not provide a basis to exclude noncash assets when read alone or in conjunction with section 6-10(5).

Appellants also maintain that Intrust's bookkeeping shortcomings cannot defeat their right to the return of their noncash assets.  While it is true that account holders should not be penalized for Intrust's inadequate accounting software and accounting methods, the fact remains that the methods were deficient and as a result there is a loss of $68.1 million.  This is an action in equity and the trial court was required to do what was best in light of the circumstances before it with respect to all the claimants who were impacted by this shortfall. As previously discussed, although this is a statutory action, equitable tracing principals must still apply unless contravened under the statute pursuant to which the action is commenced.  See, 
e.g.
, 
Woodhouse
, 197 Ill. 104, 64 N.E. 292,
 Doyle,
 486 F. Supp. 1214, and 
First State Trust & Savings Bank
, 103 Fla. 1136, 138 So. 733.  In 
Doyle
, the broker maintained inadequate records that resulted in ultimate detriment to some claimants over others.  The same situation exists here.  While it is an unfortunate situation, the result obtained in this case is what was necessary in light of the circumstances.

In conclusion, noncash account holders are not entitled to a preference over cash account holders because all deposits made with Intrust were special deposits that must be treated equally.  Likewise, the evidence is insufficient to directly trace an individual account holder's deposit in the commingled fund to the noncash asset such account holder now possesses.  Accordingly, the "equality is equity" rule must prevail.

V.  Charging of Receiver's Fee to Individual Accounts

A.  Invasion of Accounts

Appellants (O'Brien) contend that the trial court erred in invading the individual accounts to pay the receiver's fees and expenses.  According to them, the plain language of sections 6-13 and 6-10(14) of the Act prohibits invasion of the individual accounts to pay all types of fees and only allow invasion of the individual accounts for the "usual and customary" fees incurred in administering the individual accounts.  We agree. 

Contrary to the receiver's contention, the determination of this issue involves a question of statutory construction that is subject to 
de novo
 review.  
Advincula v. United Blood Services
, 176 Ill. 2d 1, 12, 678 N.E.2d 1009 (1996).  The primary goal of statutory construction is to ascertain and give effect to the intent of the legislature, and the most reliable indication of the legislature's intent is the plain language of the statute itself.  
Premier Property Management, Inc. v. Chavez
, 191 Ill. 2d 101, 121, 728 N.E.2d 476 (2000).  We must examine the language as a whole and consider each part or section in connection with every other part or section.  
Antunes v. Sookhakitch
, 146 Ill. 2d 477, 484, 588 N.E.2d 1111 (1992).  We must also construe the statute so that no word or phrase is rendered meaningless.  
Westcon/Dillingham Microtunneling v. Walsh Construction Co. of Illinois
, 319 Ill. App. 3d 870, 875, 747 N.E.2d 410 (2001).  Accordingly, "courts must give effect to every word, clause, and sentence and may not read a statute so as to render any part inoperative, superfluous, or insignificant."  
Newland v. Budget Rent-A-Car Systems, Inc.
, 319 Ill. App. 3d 453, 456, 744 N.E.2d 902 (2001).  We "must not depart from a statute's plain language by reading into it exceptions, limitations, or conditions the legislature did not express."  
Newland
, 319 Ill. App. 3d at 456.  "It is also well settled that statutes should be construed to give them a reasonable meaning and to avoid absurdity or hardship."  
Hearne v. Chicago School Reform Board of Trustees of the Board of Education for the City of Chicago
, 322 Ill. App. 3d 467, 476, 749 N.E.2d 411 (2001).  Where provisions of a statute appear to conflict, we must, if possible, construe them in harmony.  
Newland
, 319 Ill. App. 3d at 456.  The legislature is presumed to act rationally in enacting statutes and with full knowledge of all prior enactments.  
Ferguson v. McKenzie
, No. 89144, slip op. at 12 (January 29, 2001).  Lastly, substantial deference and weight should be given to an interpretation of a statute by the agency charged with administering it.  
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 88, 606 N.E.2d 1111 (1992); 
Lalvani v. Illinois Human Rights Comm'n
, 324 Ill. App. 3d 774, 783, 755 N.E.2d 51 (2001).

Three statutory provisions of the Act are relevant and at issue here.  Section 6-10, entitled "Receiver's power, duties and responsibilities," states:

"For its services in administering the trusts and other fiduciary accounts of the corporate fiduciary during the period of winding up the affairs of the corporate fiduciary, the receiver shall be entitled to be reimbursed for all costs and expenses incurred by the receiver and shall also be entitled to receive out of the assets of the individual fiduciary accounts being administered by the receiver during the period of winding up the affairs of the corporate fiduciary and prior to the appointment of a successor trustee or fiduciary, the usual and customary fees charged by the receiver in the administration of its own fiduciary accounts or reasonable fees approved by the Commissioner.
" 205 ILCS 620/6-10(14) (West 1998).

Section 6-13 provides:

"All expenses of a receivership, including reasonable receiver's and attorney's fees, approved by the Commissioner, shall be paid out of the assets of the corporate fiduciary.  All expenses of any preliminary or other examination into the condition of any such corporate fiduciary or receivership, and all expenses incident to and in connection with the possession and control of the corporate fiduciary and its assets for the purpose of examination, reorganization or liquidation through receivership shall be paid out of the assets of such corporate fiduciary.  The payment herein authorized may be made by the Commissioner with monies and property of the corporate fiduciary in his or her possession and control and shall have priority over all claims but shall not give rise to a claim against properties held by the corporate fiduciary in a fiduciary capacity.  If monies and property of the corporate fiduciary are insufficient to pay such expenses, they may be paid from the Corporate Fiduciary Receivership account in the Bank and Trust Company Fund established pursuant to Section 5-10 of this Act."  205 ILCS 620/6-13 (West 1998).

And, section 5-10 provides:

"
In addition to the fees authorized in subsection (a) of this Section [fees for the Commissioner], the Commissioner shall assess reasonable receivership fees and establish a Corporate Fiduciary Receivership account in the Bank and Trust Company Fund to provide for the expenses that arise from the administration of the receivership of a corporate fiduciary under this Act.  The aggregate of such assessments shall be paid into the Corporate Fiduciary Receivership account in the Bank and Trust Company Fund."  205 ILCS 620/5-10(b) (West 1998).

Although the Act does not define "trust accounts" or "fiduciary accounts," there is no dispute that such accounts are distinct and different from the corporation's own accounts and assets.  With respect to section 6-10, the legislature has clearly made a distinction and recognized the difference in the entire section between the two types of accounts.  Specifically, section 6-10(11) states: 

"The receiver shall record any judgment of dissolution entered in a dissolution proceeding and thereupon turn over to the Commissioner a certified copy thereof, 
together with all books of accounts and ledgers of such corporate fiduciary for preservation, as distinguished from the books of accounts and ledgers of the corporate fiduciary relating to the assets of the beneficiaries of such fiduciary relations
, all of which books of accounts and ledgers shall be turned over by the receiver to the successor trustee or fiduciary.
"  (Emphasis added.)  205 ILCS 620/6-10(11) (West 1998).  

Subsection (14) of section 6-10 refers only to trust or fiduciary accounts.  It does not reference or relate to any of the corporation's accounts.  The sole topic  of section 6-10(14) is the administration of trust accounts.  

Moreover, the prefatory language of subsection (14) is instructive.  It states that, "[f]or its 
services in administering the trusts and other fiduciary accounts
" (emphasis added) (205 ILCS 620/6-10(14) (West 1998)), the receiver shall be entitled to reimbursement.  Thus, section 6-10(14) pertains only to those services rendered in the administration of the individual accounts; it does not relate to general services rendered that are not specific to the individual accounts.  Significantly, based on the unequivocal language, subsection (14) does not relate to services rendered by the receiver in connection with the receivership proceedings.  In this case, the receiver sought advanced fees to complete the process of allocation, engage in hearings with respect to the allocation, sell Intrust, prosecute the litigation against Intercounty, and set up a claims administration process.  These are general receivership services.  While such services may well collaterally benefit the individual accounts, they are not, however, services for administration of the accounts.  Accordingly, we disagree with the receiver and trial court--subsection (14) of section 6-10 does not give the receiver, or the trial court, authority to invade and charge the individual trust accounts for fees relative to the receivership.

On the other hand, however, section 6-13 deals with services attendant to the receivership.  This provision explicitly states that the expenses of the receivership and reasonable receiver's fees shall be paid from the corporate assets.  What is abundantly evident is that the expenses of the receivership, including examination, evaluation, and litigation, are distinct from expenses and services attendant to administering an individual account.  Moreover, section 6-13 unequivocally states that the receivership expenses and receiver's fees shall not give rise to claims against the individual accounts.  If they cannot give rise to claims against the individual accounts, the accounts surely cannot be invaded for such expenses.  Section 6-13, after setting forth the fact that the receivership expenses are to be paid out of the corporate assets, adds that if the corporate assets are insufficient, the receiver is to look to the corporate fiduciary receivership account (Receivership Account), provided for in section 5-10, for its fees.  Thus, section 6-13 sets forth two sources for payment of expenses of the receivership: (1) corporate assets or (2) the Receivership Account.  Clearly, subsection (14) of section 6-10 and section 6-13 cover individualistic categories of expenses and services and, thus, can easily be harmonized.

Moreover, the receiver contends that section 6-10(4) was adopted after section 6-13 and, thus, supersedes section 6-13 or manifests a legislative intent to retreat from section 6-13's provisions.  We disagree.  At the same time the legislature added subsection (14) of section 6-10, it also added the language in section 6-13 with respect to insufficiency of corporate assets for fees and that the receiver, in that situation, was to seek payment from the Receivership Account.  If the legislature had intended to allow the receiver to invade the individual accounts for its receivership fees, the legislature would have had to incorporate additional and/or different language in both subsection (14) and section 6-13.  It did not do so.  If we read the sections as the receiver urges, it would render section 6-10(14) meaningless and inoperative.  Additionally, if we read the statute as the receiver suggests, we would be adding "and for its services with respect to the receivership" into section 6-10(14).  Contrary to the plain and unambiguous language of the statute, this would allow the receiver to obtain 
compensation from the individual accounts for all services attendant to the receivership, rather than compensation for only those services attendant to administration of the individual accounts.  In other words, such a reading would give the receiver three alternatives for payment of receivership fees, rather than the two established by the legislature.  Such a result is not authorized by the Act, nor contemplated by it.

Additionally, the legislature was aware when it added subsection (14), of what was set forth in section 6-13, since the legislature amended section 6-13 at the same time it added subsection (14).  It could not have amended section 6-13 without knowing what was already contained and stated therein.

It should also be noted, as pointed out by appellants, that the Commissioner's letter appointing the receiver dated April 14, 2000, states that the Commissioner had approved a plan for compensation of the receiver for reasonable expenses, which expenses were to be paid out of the corporate assets but not out of the individual accounts.  Specifically, the letter stated:

"Pursuant to Section 6-13 of the Corporate Fiduciary Act, I [the Commissioner] have approved a plan for compensating the Receiver for reasonable expenses, including but not limited to expenses attributed to attorneys fees, which shall be paid out of the assets of Independent Trust Corporation.  Such compensation shall have priority over all claims, but shall not give rise to a claim against properties held by Independent Trust Corporation in a fiduciary capacity."

To the extent that deference must be given to the agency in charge of enforcement of the Act, this letter by the Commissioner gains additional significance.  In addition, the order of administration entered by the trial court on April 14, 2000, contained the following provisions:

"For its services in administering the trust and other fiduciary accounts of [Intrust], the Receiver has been and is hereby authorized payments pursuant to section 6-10 of the Act, to be reimbursed for the cost and expenses of the Receiver, and the [Intrust] estate shall also be entitled to receive out of trust assets, the usual and customary fees charged to the accounts or such reasonable fees as may be approved by the Commissioner or his authorized agents."

Similarly, the order provided:

"Fees and expenses incurred by the Receiver and Receiver's attorneys and other professionals in connection with or pertaining to [Intrust] (including services rendered and expenses incurred in preparation for this proceeding), shall be and are hereby accorded the priority provided in section 6-13 of the Act; and the Receiver is authorized, upon receipt of invoice and approval of such invoice by the Commissioner or his authorized agents, to pay such fees and expenses from the corporate funds of the [Intrust] estate."

Lastly, the order provided:

"The Receiver is authorized, with the approval of the Commissioner or his authorized agent, to employ such professionals, firms, attorneys, accountants and other assistants as may be necessary or proper to the administration, receivership and liquidation of [Intrust], and to compensate such persons and firms from the corporate funds of the [Intrust] estate."

Clearly, from the above recitations contained in the documents filed with the court and provided to the receiver, the receiver, and the trial court, had notice and had to be cognizant of the fact that expenses attendant to the receivership were not chargeable to the individual accounts. 

Based on the foregoing, we conclude that the trial court erred in charging 
all
 expenses sought by the receiver to the individual accounts.  The receiver was only authorized to charge to the individual accounts those usual and customary fees that a corporate fiduciary generally charges for administering its individual fiduciary accounts.  Alternatively, the receiver may charge those fees for services that are "reasonable [as] approved by the Commissioner" and assessed by the circuit court.  The latter alternative criterion is particularly applicable where as is the case here, the receiver has not been shown to be engaged in the business of being a corporate fiduciary as defined by the Act.  

Thus, under section 6-10(14), the receiver may recover from the individual accounts fees for those services not included under section 6-13, and which would appear to correlate to those services that are generally performed by a corporate fiduciary in the absence of a receivership.  Fees for those services engendered under section 6-13, namely services peculiar to the receivership function rather than that of a regular corporate fiduciary, are reimbursable only from the corporate fiduciary notwithstanding that those services may also be of coincidental benefit to the individual account holders.  Since the receiver did not allocate the fees it sought, in particular, it did not detail what part of the $2.1 million was for administering the individual fiduciary accounts, and the trial court failed to undertake such a determination, we remand this cause to the circuit court for proceedings consistent with our decision.

B.  Reasonableness Assessment

Appellants also contend that the trial court abused its discretion in failing to ascertain whether the fees requested by the receiver were reasonable.  Appellants rely on 
In re Pine Top Insurance Co.
, 292 Ill. App. 3d 597, 686 N.E.2d 657 (1997), for the proposition that the trial court is required to conduct a reasonableness assessment of the requested fees.

In 
Pine Top Insurance
, an insurance company liquidation case, the appellate court concluded that the trial court erred in failing to conduct a reasonableness analysis in determining whether fees awarded to the attorneys, as agreed to by the Director of Insurance, were proper (
Pine Top Insurance
, 292 Ill. App. 3d at 598), as the trial court "must conduct a reasonableness analysis of the Director's decision."  
Pine Top Insurance
, 292 Ill. App. 3d at 604.  In reaching its conclusion, the 
Pine Top Insurance
 court looked to other areas of law where the trial court is required to conduct a reasonableness analysis prior to awarding or denying fees including probate law, fee-shifting contractual agreements, and class actions.  
Pine Top Insurance
, 292 Ill. App. 3d at 604.  Lastly, the 
Pine Top Insurance
 court looked to the Rules of Professional Conduct that outline relevant factors in analyzing reasonableness of fees.  
Pine Top Insurance
, 292 Ill. App. 3d at 605.  The court then looked to case law and concluded:;

"More importantly, 
Board of Commissioners [of the Bollingbrook Park District v. County of Will
, 154 Ill. App. 3d 395, 506 N.E.2d 1044 (1987),] highlights the importance of analyzing factors and setting forth what particular elements are accorded more weight and why when reducing or denying fees.  The trial court's detailing of the factors and justifications is even more compelling in liquidation proceedings where the Director is statutorily given power to set counsel's rate and the court decides the rate is inappropriate."  
Pine Top Insurance
, 292 Ill. App. 3d at 606.

Admittedly, 
Pine Top Insurance
 contains different factual circumstances than those present in the case 
sub judice
.  First, 
Pine Top Insurance
 involved attorney fees only.  More importantly, though, the statutory provision in insurance liquidation cases specifically requires that any attorney fees, as fixed by the Director, be subject to approval by the court.  There is no such provision in the Act.

Despite these differences, we believe that the trial court in proceedings under the Act must undertake some examination of fees, as approved by the Commissioner, to determine if they are fair and adequate, 
i.e.
, reasonable, and not simply rubber stamp the amount approved by the Commissioner.  We do not mean to say that a hearing is necessarily required, but some sort of review of the fees requested and basis for such fees is necessary.  We reach this conclusion for several reasons.  

First, it traditionally has been the function of the trial court to review the reasonableness of requested fees in many contexts.  See 
Pine Top Insurance
, 292 Ill. App. 3d at 604-05 (identify types of proceedings in which trial court reviews reasonableness of fees).  Second, in equity receiverships, which we note are different than the statutory receivership at issue before us, the trial court has long been afforded the duty of reviewing the reasonableness of fees.  See 
Brackett v. Sedlacek
, 116 Ill. App. 3d 978, 981, 452 N.E.2d 837 (1983); 
Plote, Inc. v. Minnesota Alden Corp.
, 95 Ill. App. 3d 5, 7, 419 N.E.2d 492 (1981).  See also 
Fiorito v. Jones
, 72 Ill. 2d 73, 377 N.E.2d 1019 (1978).  Third, proceedings under the Act are under the control and supervision of the court and, pursuant to section 6-4, the trial court is given authority to determine all issues raised in the liquidation proceedings--reasonableness of fees is one such issue.  This is particularly true here since the receiver brought the issue of fees before the court seeking its approval to dip into the trust accounts for their payment. 

We note that a reasonableness assessment in the case 
sub judice
 is all the more appropriate since the court permitted fees to be paid in advance.  This case, unlike most cases, does not involve a request for fees for services already performed and, therefore, readily reviewable and ascertainable.

Clearly, to the limited extent that the receiver was permitted to dip into individual trust funds, which would constitute a taking of private funds without consent, the trial court must be afforded the ability to review the reasonableness of fees.  However, even where private funds are not involved, where, as previously discussed, the
 reimbursement is made from assets of the corporation or Receivership Account, such supervision by the court should be required and the propriety of the disbursement should not rest solely upon the administrative discretion of the Commissioner. See 
Yellow Cab Cooperative Ass'n v. Mathis
, 185 B.R. 844, 849 (D. Colo. 1995), stating:

"This Court concludes that the process by which Judge Hufnagel approved professionals' fees was unseemly streamlined, almost invisible, and encased in mystery; it was a judicial process on automatic pilot.

At the very least, the Debtor and interested parties were not afforded due process regarding the award of fees; neither the Debtor nor other interested parties were effectively given notice and an opportunity to object, or otherwise be heard, on the issue of the professionals' fees in this case."

Based on the foregoing, a trial court is required to undertake a review of the the reasonableness of fees sought by a receiver subsequent to approval of those fees by the Commissioner.

VI.  Exclusion of Agabedis Account:

Closed Subsequent to April 23, 1999

Appellants (Agabedis) contend that the trial court erred in excluding the accounts held by them because in June 1999 they transferred all of their Intrust account assets to a new account and all of their assets were accounted for at that time.  We disagree.

The factual circumstances involving these appellants' accounts are as follows.  Appellants held accounts with Intrust prior to April 23, 1999. Subsequent thereto, they made a change in their investment advisor and pursuant to this change as a matter of administrative convenience, they were required to close their original accounts and open new accounts.  The deposits that funded the new accounts were derived from liquidation of noncash assets or other investments held by Intrust in their old accounts during the misappropriation period.  Accordingly, like every other account holder, due to the commingling and inability to trace specific deposits, there is no way to determine that the funds used to open appellants' new accounts were actually the appellants' deposits.  Based on the facts present in this case, the money used to fund the new accounts could just have logically and reasonably been the funds of another account holder.  

The Agabedis group contends that it came within the exclusion sanctioned by the court for accounts that were closed out before the receivership commenced.  We disagree since the apparent purpose of that exclusion was to avoid the need to pursue disbursed funds now in private hands.  The contemplated extensive legal process and doubtful result that could be anticipated in such circumstances made pursuit impracticable.  Here, the funds are clearly at hand and have never been actually removed except through a mere bookkeeping transaction.

Therefore, the trial court did not err in denying exclusion of appellants' accounts from the allocation process.

VII.  Allocation as to Each Date of Misappropriation:

Use of Account Statements Held by Account Holder Abbott

The Abbott appellants contend that the trial court should have made the allocation determination as of each date of misappropriation with respect to their accounts because they can prove, via their account statements, the amount of money in their accounts on each date.  We disagree. 

This allocation method was submitted to the trial court and rejected based on the impossibility of ascertaining each account balance on each misappropriation date.  The trial court had a rational basis for this decision.  As discussed above, it was and is impossible to determine any individual account balance on any particular day, including the dates of misappropriation.  While it may be true that appellants have statements indicating their account balance on each particular misappropriation date, as the receiver has stated, these statements are not necessarily accurate due to Intrust's accounting methods and the fact certain transactions were not recorded as they occurred.  As a result, there is ample support for the trial court's refusal to exclude these accounts from the allocation process, which we shall not disturb.

VIII.  Exclusion of IRA Account;

 Account Holder Bard

Appellants (Bard) contend that the trial court erred in including their IRA accounts in the allocation process.  We disagree. 

Initially, we are not persuaded by appellants' argument that because their deposits could not legally be commingled, pursuant to their written agreement with Intrust, and the fact that Intrust failed to fully collateralize the commingled account as required by section 2-8 of the Act, their accounts must be excluded.  Whether Intrust was allowed to commingle appellants' deposits or not, the fact of the matter is that Intrust did so, albeit in possible violation of the agreement.  This court cannot ignore or undo what has already been done.  Appellants' deposits were commingled and, therefore, subject to a risk of loss from misappropriation as any other account.  While this is an unfortunate situation and Intrust may have breached its fiduciary duty to appellants, their funds were nonetheless commingled.

We also disagree with appellants that only a portion of their account balances should be included because when they made their deposits some misappropriation had already occurred.  As discussed above, it is impossible to determine any individual account balance at any particular time.  Intrust's records simply are not able to recreate this historical data.  Appellants request this court to "age trace" their funds, which is simply not possible.  

The crux of appellants' argument is that their accounts are special deposits and are not subject to forfeiture, which is the ultimate result of the allocation process according to them, pursuant to 26 U.S.C. §408(a)(4) (1994).  While we agree with appellants that their accounts are special deposits, this does not render appellants' accounts unique and separate from all other special account holders insofar as it pertains to the allocation of any priorities among them.  As repeatedly addressed above, all deposits at Intrust were special deposits.

Having determined that none of the above bases are persuasive, we must now determine whether it was erroneous for the trial court to allocate the cash shortage to appellants' IRA accounts because the allocation constituted an impermissible forfeiture of such accounts.  Appellants rely on section 408(a)(4) of the Internal Revenue Code for the position that IRA accounts cannot be forfeited.  This section states:

"The interest of an individual in the balance in his account is nonforfeitable."  26 U.S.C. §408(a)(4) (2000).

Section 408(a)(4) does not support appellants' position.  First, this provision is part of the Internal Revenue Code and deals with what monies can be taxed and what monies cannot be taxed.  More importantly, subsection (4) is only a part of a larger scheme which appellants ignore.  Subsection 40808(4) is one part of the definition of what the Internal Revenue Service will consider as meeting the qualifications for an IRA.  The entire provision states:

"For purposes of this section, the term 'individual retirement account' means a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust meets the following requirements:

(1)  Except in the case of a rollover contribution ***, no contribution will be accepted unless it is in cash, and contributions will not be accepted for the taxable year on behalf of an individual in excess of the amount in effect for such taxable year ***.

(2)  The trustee is a bank *** or such other person who demonstrates to the satisfaction of the Secretary that the manner in which such other person will administer the trust will be consistent with the requirements of this section.

(3)  No part of the trust funds will be invested in life insurance contracts.

(4)  The interest of an individual in the balance in his account is nonforfeitable.

(5)  The assets of the trust will not be commingled with other property except in a common trust fund or common investment fund."  26 U.S.C. §408(a) (1994).

Clearly, subsection (4) is but one part of the definition of an IRA and does not stand alone as a rule of law.  Lastly and more overridingly, section 408(a)(4) is not applicable to the circumstances presented in this case.  

In 
Goldblatt v. Federal Deposit Insurance Corp.
, 105 F.3d 1325 (9th Cir. 1997), the FDIC disbursed the plaintiff's IRA assets as part of a 
pro rata
 distribution of an insolvent bank's assets.  The plaintiff argued that since IRA assets are nonforfeitable under section 408(a)(4), the FDIC was prohibited from distributing his IRA assets to the general creditors as part of the insolvency.  The court disagreed, noting that section 408(a)(4) precludes a bank from offsetting a borrower's defaulted loan debt with the borrower's IRA deposit and it prohibits forfeiture of IRA assets in the criminal context in some cases.  
Goldblatt
, 105 F.3d at 1329.  "However, the provision does not apply where a depositor lost assets as a result of a bank's insolvency."  
Goldblatt
, 105 F.3d at 1329.  Accordingly, the court concluded that the IRA assets were properly distributed.  As in 
Goldblatt
, section 408(a)(4) does not apply to the case before us.

In any event, allocation of the cash shortage does not constitute a forfeiture.  Forfeit is defined as:

"To lose, or lose the right to, by some error, fault, offense, or crime; ***. To incur a penalty; to become liable to the payment of a sum of money, as the consequence of a certain act[;] 

To lose *** property *** as a consequence of some misfeasance, negligence, or omission."  Black's Law Dictionary at 584 (5th ed. 1979).

Forfeiture is defined as:

"Something to which the right is lost by the commission of a crime or fault or the losing of something by way of penalty.  ***  Loss of some right or property as a penalty for some illegal act.  Loss of property or money because of breach of a legal obligation."  Black's Law Dictionary at 584-85 (5th ed. 1979).

The crux of forfeiture is punishment or penalty for some improper conduct or act done by the party against whom forfeiture is sought.  Clearly, while appellants may believe they are being punished, in the legal connotation of the word, they are not being punished for some inappropriate or illegal act they committed.  See 
Goldblatt
, 105 F.3d at 1329 (distribution of the plaintiff's IRA assets occurred as part of the bank's insolvency, "not as a penalty to [the plaintiff] for failure to perform an obligation to the Bank").  As a result, the cash shortage allocation does not constitute a forfeiture.  
Goldblatt
, 105 F.3d at 1329. 

None of the cases relied upon by appellants, either in their original brief or their supplement to this court, aid them.  All involve the situation where a beneficiary was seeking a preference over general creditors and the question was whether the beneficiary's interest was a special deposit warranting preference.  In addition, the cases all involved the situation where the trustee or individual with whom the plaintiffs deposited money commingled the deposited money with the general funds of the bank.  These cases merely follow the well-established principles of law set forth above.  They do not, like 
Woodhouse
, deal with the situation where multiple trust fund beneficiaries are battling each other--a situation where the rules and principles are different--and the situation present in the instant case.  In fact, in one case 
People ex rel. Nelson v. Illinois Bank & Trust Co. of Benton
, 290 Ill. App. 521, 8 N.E.2d 953 (1937), the court clearly stated that claimant was entitled to a preference over the bank's general creditors in the assets of the insolvent bank held by the receiver "subject to the right of other claimants similarly situated as appellant to participate therein."  
Nelson
, 290 Ill. App. 3d at 529.

Based on the foregoing, the trial court did not err in denying exclusion of appellants' accounts from the allocation process.

IX.  Mootness

The last issue in this appeal is mootness.  The receiver contends that based upon events subsequent to the trial court's final order, this appeal has been rendered moot.  In particular, the implementation and collection of the shortage has been completed and, therefore, implementation of any other method would be impractical and "would force thousands of account holders, Millennium and the Trial Court to try and undo 'many intricate and involved transactions,' leaving both entities with 'an unmanageable, uncontrollable situation.' " 

As a reviewing court, we can only decide "actual controversies in which the interests or rights of the parties can be granted effectual relief."  
In re Marriage of Petersen
, 319 Ill. App. 3d 325, 334-35, 744 N.E.2d 877 (2001).  "An appeal becomes moot when a court can no longer effect the relief originally sought by an appellant or when the substantial question involved in the trial court no longer exists."  
In re Marriage of Petersen
, 319 Ill. App. 3d at 335.  A case can become moot when, pending the decision on appeal, certain events occur that render it impossible for the reviewing court to grant effectual relief to either party.  
Bluthardt v. Breslin
, 74 Ill. 2d 246, 250, 384 N.E.2d 1309 (1979).

While it is true that had we decided to reverse the final order, it would be difficult, time consuming, and confusing to reimburse those payments already made to Intrust and to implement another allocation method, the trial court still retains jurisdiction over the accounts, the accounts remain frozen, and no actual disbursements have been made.  As such, if we had reversed, we could have effectuated the relief sought by appellants.  Accordingly, the issues raised in this appeal have not been rendered moot by subsequent events.

CONCLUSION

In sum, we affirm the trial court's allocation method 
in toto
.  We, however, reverse and remand the trial court's decision to charge receiver fees and expenses to the individual account holders.

Affirmed in part and reversed in part; cause remanded.

CAHILL and McBRIDE, JJ., concur.

FOOTNOTES
1:
There are additional non-cash-asset account holders who have not appealed.  Similarly, there are cash asset account holders who also have not appealed.  We use the term "appellants" and "noncash account holders" interchangeably in this opinion and intend to refer only to the noncash account holders who have appealed.

2:
Appellants allege that these amounts were managed by Intrust.  However, their citations to the record do not support their factual statement.

3:
The record does not disclose the number of accounts originally opened with cash versus the number of accounts opened through trustee-to-trustee transfers.  However, we presume that a majority of accounts were opened with cash based on the fact only three trustee-to-trustee motions to exclude, as discussed below, were filed.

4:
The record is not entirely clear on the exact number of deposits made at Intercounty.  Although one document states that 41 deposits were made, another document states that 84 deposits were made by Intrust at Intercounty.

5:
It appears that most parties, including the receiver, agree that 36 withdrawals were made from Intercounty.  However, one group of appellants states that the number was 33 and another document in the record states that there were 68 withdrawals from Intercounty.

6:
The record does not disclose the exact number, but 209 account holders have filed an appeal from the trial court's decision.

7:
The fees were apportioned according to the balance of the accounts: $0 to $10,000, no fee; $10,001 to $100,000, $125; and $100,000 plus, $265.

8:
Because of this ruling, the valuation date for the allocation process was subsequently changed from April 2000 to March 30, 1999.

9:
This hearing was scheduled for October 11, 2001, and was continued until November 1.

10:
Two additional general briefs were filed one simply incorporating the O'Brien brief (Cooper Linse Hallman Management group) and a second (Rosenberg group) that made the same basic argument as the O'Brien group although labeling it differently.

11:
How jurisdiction is obtained with respect to each account holder without a separate complaint and personal service shall be dealt with below.

12:
Because we so conclude, we will deal with the adequacy of notice under appellants' due process challenge.

13:
Because we have concluded above that individual complaints and individual service of process upon each of the 17,000 account holders was not required, we need not again address this issue.

14:
We note that in 
Mullane
 in considering the sufficiency of notice to known beneficiaries, the Court did not consider the sufficiency of website notice since 
Mullane
 preceded the Internet era.

15:
Appellants Agabedis, Abbott, Bard, and Rosenberg adopt the arguments made with respect to this issue.

16:
The issue of how the funds were actually to be divided among the various claimants was not an issue before the court.  
In re Michigan Boiler & Engineering
, 171 B.R. at 573 n.4.

17:
This facet of the case will be addressed below.

18:
This provision, entitled "Collateralized fiduciary assets," allows a corporate fiduciary to commingle deposits but states that funds of the account holders should not be held any longer than reasonable for proper management of the accounts.  205 ILCS 620/2-8 (West 1998).